## C. J. TOWER & SONS v. UNITED STATES.

## UNITED STATES v. C. J. TOWER & SONS.
### Nos. 3595, 3622.

Court of Customs and Patent Appeals.
Feb. 5, 1934.

Barnes, Richardson & Halstead, of New York City (Samuel M. Richardson, of New York City, of counsel), for Tower & Sons.

Charles D. Lawrence, Asst. Atty. Gen. (Peter A. Abeles, Sp. Atty., of New York City, of counsel), for the United States.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

On April 22, 1922, the following order, officially known as "T. D. 39071," was pro-

mulgated by the United States Treasury Department:

"Antidumping act, 1921—Finding by the Secretary of the Treasury

"The Secretary of the Treasury makes finding under section 201 (a), antidumping act, 1921, of dumping in the case of wheat flour from Canada

"Treasury Department, April 22, 1922.

"To Collectors of Customs and Others Concerned:

"Section 201 (a) of the Anti-Dumping act, 1921, provides as follows:

" 'Sec. 201. (a) Whenever the Secretary of the Treasury (hereinafter called the "Secretary"), after such investigation as he deems necessary, finds that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation into the United States of a class or kind of foreign merchandise, and that merchandise of such class or kind is being sold or is likely to be sold in the United States or elsewhere at less than its fair value, then he shall make such finding public to the extent he deems necessary, together with a description of the class or kind of merchandise to which it applies in such detail as may be necessary for the guidance of the appraising officers.'

"After due investigation I find that the industry of making wheat flour in the United States is being or is likely to be injured by reason of the importation into the United States of wheat flour from Canada and that such merchandise is sold or is likely to be sold in the United States at less than its fair value.

"By direction of the Secretary.
"(106085.)          Elmer Dover,
          "Assistant Secretary."

Thereafter, certain wheat flour was imported by C. J. Tower & Sons at the ports of Niagara Falls and Buffalo. All of the entries at both ports were made under the Act of October 3, 1913 (38 Stat. 114).

Proceeding under the claimed authority of the foregoing T. D. 39071, the collector in each case assessed dumping duties in accordance with the provisions of section 202 (a) of said Anti-Dumping Act 1921, 42 Stat. 11 (19 USCA § 161 (a).

Thereafter, the importer duly filed its protest with the collectors at the ports of Niagara Falls and Buffalo against said exaction. The various grounds of protest will

sufficiently appear from our discussion of the issues hereinafter.

On appeal to the United States Customs Court, the cases were consolidated by stipulation and a motion was made by the importer that the consolidated cases might be transferred for hearing at Washington for the purpose of taking the oral testimony of Andrew W. Mellon, Secretary of the Treasury. This motion was duly filed in the office of the clerk of the United States Customs Court and was heard by the First Division and denied. Thereupon a motion was addressed to the chief justice of the court asking for such a transfer. This transfer was opposed by the Government and the chief justice duly denied the transfer, stating that the court had consistently refused to grant such motions when opposition was made thereto. Thereupon an application was made for a commission to take the deposition of said Andrew W. Mellon on oral interrogatories, or, in the alternative, on written interrogatories, which motion was allowed on written interrogatories.

These interrogatories were duly prepared and certain of them were objected to on the part of the Government, as a result of which the sixth, tenth, eleventh, twelfth, thirteenth, fifteenth, and seventeenth interrogatories were held to be objectionable and were not propounded to the witness Mellon.

The commission, with its interrogatories and answers thereto, was duly offered in evidence, and the cause was submitted upon said deposition and the following stipulations of facts. As to the entries at the port of Buffalo, entries B33, B187, B1843, B336, and B391, it was stipulated:

"1. It is stipulated and agreed by and between Mr. Barnes, counsel for the importers, and the attorney for the Government, that neither the appraiser nor any officer of the Government under his authority had before him at the time of the appraisal of the merchandise in the entries recited, any examination packages or any samples of the merchandise, nor was any examination of the merchandise made by the appraiser or his examiners at the time of appraisal.

"2. That the official examiners representing the appraiser inspected the cars containing the flour involved in these entries at the time of the arrival of the same."

As to the Niagara Falls entries, NF76, NF165, NF2583, the following was stipulated:

"1. * * * that Mr. Thomas M. Hennessy, the acting appraiser who was also

the deputy collector in charge, had samples of the flour covered by the entries referred to in his possession at the time of arrival and at the time of appraisal.

"2. That the samples of flour taken from the instant importations and from which Mr. Hennessy made his appraisement, became moldy and decomposed and full of weevils, and he was obliged to destroy these samples about six months after appraisement of the merchandise herein.

"3. That the said samples were kept by the acting appraiser at his office in the Post Office Building at Niagara Falls in paper envelopes and wooden boxes, and that this was his customary way in which he kept all samples of flour imported at Niagara Falls.

"4. It shall not be deemed by this stipulation that the Government abandons its motion made before the reappraisement Court in these cases to dismiss the appeals to reappraisement on the ground that the same were not timely, the importer reserving the right to an objection as to the materiality of this motion to dismiss in this proceeding."

It was also stipulated, generally: "It is also stipulated and agreed that neither the collector nor the appraiser nor any other customs officer at the ports of Buffalo or Niagara Falls forwarded any of this merchandise or samples thereof to the Board of General Appraisers at any time, and that the importers likewise at no time forwarded a sample of the merchandise to the Board of General Appraisers at or before the time the appeal to reappraisement was taken."

In this case protest 224959—G covers entries at the port of Buffalo, N. Y., and protest 224958—G the entries at Niagara Falls.

The United States Customs Court found from the stipulation that the merchandise involved in the Buffalo entries, namely, B33, B187, B1843, B336, and B391 covered by protest 224959—G, was not before the appraiser when the appraisement was made, was not examined or appraised by him, and that the appraisement as to all of said entries was null and void. As to the Niagara Falls entries, NF76, NF165, and NF2583, covered by protest 224958—G, the court found that the appraiser had samples of the merchandise before him at the time of appraisal, and that the destruction thereof afterward, because of their decayed condition, did not invalidate the appraisement. It also held that the dumping order under which the collector proceeded to assess additional duties was a lawful exercise by the Secretary of the Treasury of the power given to him by said Anti-Dumping Act of 1921; that the said act was, and is, constitutional; that the said antidumping order was properly signed and issued; that the said additional duties provided by said section 202 (a) are not penal in their nature; and that the protest should be overruled. In coming to this conclusion, one member of the court dissented.

From the resulting judgment the Government has appealed as to the decision of the court sustaining the protest upon the Buffalo entries. The importer has appealed from the decision upon the Niagara Falls entries.

On its part, the Government contends here that, as to the Buffalo entries, it must be presumed that the officers of the port performed their official duties and examined the imported goods at or before the time of appraisement; that the burden was upon the importer to prove that they had not done so, which burden, it is insisted, the importer has not sustained, and in the absence of which it will be presumed everything was done by these officials which was required to be done; that the appraisement of the goods was properly made at the port of Buffalo; and that the court erred in finding the same to be void and of no effect.

The importer insists that the judgment of the Customs Court as to the entries at Niagara Falls is erroneous for many reasons, the principal attack being upon the validity and constitutionality of the provisions of the Anti-Dumping Act of 1921 (19 USCA §§ 160–173). It is argued that, as to these provisions, the effect of the act is to impose upon the importer a penalty, and that, inasmuch as it is a penalty, the importer was deprived of his property without due process of law, and that the United States Customs Court had no jurisdiction in the case; that if the law be so construed as to give such jurisdiction to said court, it is unconstitutional. It was also contended, as to the judgment upon these entries, that the appraisement was invalid because of the absence of samples, as in the case of the Buffalo entries.

Attention will first be given to the point made that the appraisement by the appraiser at the port of Buffalo was invalid because of the failure of the collector to designate one out of ten packages for examination, and because of the lack of examination of the same by the appraiser. We have held, uniformly, that under the provisions of section 2901, Revised Statutes, with certain exceptions, the mandatory duty was imposed upon the collector to designate at least one package of every ten packages of merchan-

dise to be opened, examined, and appraised, and to be sent to the public stores for such examination and for the local appraiser to examine the same and retain samples. Our latest expression on the subject is found in United States v. Steffan & Sons, 18 C. C. P. A. (Customs) 455, T. D. 44702. The authorities on the subject are extensively reviewed in Carey & Skinner v. United States, 16 Cust. App. 382, T. D. 43118. The rule is so well settled that further reference to the authorities is unnecessary.

It will be noted that in the stipulation of facts entered into by counsel for the parties as to said Buffalo entries, it was stated that neither "the appraiser nor any officer of the Government under his authority had before him, at the time of the appraisal of the merchandise in the entries recited, any examination packages or any samples of the merchandise, nor was any examination of the merchandise *made by the appraiser or his examiners at the time of appraisal.*" (Italics ours.) The further stipulation was made "that the official examiners representing the appraiser *inspected* the cars containing the flour involved in these entries at the time of the arrival of the same." (Italics ours.)

A considerable controversy has arisen between counsel as to the meaning of the language of this stipulation. It is argued on the part of Government counsel that this stipulation does not mean that the appraiser did not have samples of the merchandise before him at some time before the actual return of his appraisement, and that, if he did, this was sufficient for a valid appraisement. On the other hand, counsel for importer argue that a statement that the official examiner representing the appraiser inspected the *cars* is not a stipulation that this was an inspection of the merchandise *in the cars.* These contentions, however, are rather a play upon the words than arguments which appeal to our reason. Counsel for the parties, in making this stipulation, were endeavoring to state all of the material facts of the case plainly, so that this court would have before it all facts upon which it might adjudicate the issues between the parties.

We shall therefore consider the stipulation as a statement to the effect that the examiners who went to the railroad cars *inspected* the flour within the cars. It is equally true that the stipulation, in its reasonable interpretation, means that the appraiser did not have, at any time, before him, for examination, samples of the imported flour, and

that one package out of ten was not designated by the collector to be sent to the appraiser's store, as was by law required.

In our view of the matter, this was not a compliance with the law. It is argued by Government counsel that the case is ruled by Carey & Skinner v. United States, supra, in which we held that an examination by the appraiser on the dock of the whole of certain imported smoked meats, where no samples were retained, was a sufficient compliance with the provisions of the statute. We hardly think any such deduction may be safely drawn. In the Carey & Skinner Case, the collector had ordered the appraiser to examine the goods at the dock. This we held to be in conformity with the provisions of the law and Treasury Regulations, and administrative practice over many years.

No such order appears to have been made in the case at bar by the collector. Therefore, there appears to be no reason why the packages were not designated and the samples sent, as is required by the law. If there were no stipulation of facts in this record, certain presumptions might be indulged to aid the appraisement herein. However, we take it, as we have before observed, that the stipulation is intended to, and does, comprehend all material facts relative to the making of the appraisement of the merchandise here in question.

The word "inspected" is used in the stipulation. Even if we assume, from this, that the goods were examined in the cars for the purposes of appraisement, such fact is immaterial. There is nothing in the record to establish that the merchandise in question is bulky or perishable, which would bring it within the exceptions to the mandatory provisions of Rev. St. § 2901. Under this stipulation, samples were not taken, and, therefore, the appraisement was void, under the authorities hereinbefore referred to.

There having been no valid appraisement of the goods in question by the local appraiser, and no ascertainment of foreign-market value or cost of production by the local appraiser, under said section 202 (a), it follows that no ascertainment of the special dumping duty, provided for by said section, could be made.

The judgment of the United States Customs Court as to said protest 224959—G is, therefore, free from error.

Our next inquiry concerns the said Niagara Falls entries. Here the stipulation states

that the acting appraiser "had samples of the flour covered by the entries referred to in his possession at the time of arrival and at the time of appraisal." It further states that the acting appraiser preserved these samples for six months in the ordinary way; that they became spoiled; and that he was obliged to destroy them.

Obviously, the effect of this statement of facts is to show that all legal steps were taken by the customs officials necessary to effect a valid and legal appraisement by the local appraiser. Thereafter the importer appealed to reappraisement, and the appeal was dismissed by the Customs Court for lack of samples. This, it is argued, rendered the appraisement by the local appraiser invalid. We concur with the view of the trial court that no such deduction may be drawn. The case is clearly ruled by Carey & Skinner v. United States, supra, and the cases cited therein. Especially applicable are United States v. Scanlan, 5 Cust. App. 290, T. D. 34473, and United States v. Michelson & Co., 12 Cust. App. 402, T. D. 40584, where live cattle and ripe tomatoes were, respectively, involved. It was there held that, while a valid reappraisement without samples might not be had, this did not necessarily impair the validity of the appraisements by the local appraiser.

The same is true here. We must assume that there was a sufficient basis in these Niagara Falls entries for an assessment of dumping duty, in so far as the appraisement by the local appraiser is concerned.

Having disposed of these preliminary issues, the more serious question arises: Is the Anti-Dumping Act of 1921 within the constitutional power of the Congress to enact? It is insisted by the Assistant Attorney General that it is, and that this court has so held in the recent case of Kleberg & Co., Inc.,

v. United States, 71 F.(2d) 332, 21 C. C. P. A. (Customs) 110, T. D. 46446. In the case cited, however, the contention was made that the said act is unconstitutional, as a forbidden delegation of legislative power. We there held that the act was not subject to this constitutional objection, basing our decision on Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624, affirming same case, 14 Cust. App. 350, T. D. 42030, and many other cited cases.

Here, however, a different constitutional objection is raised, which is still an open question in this court, namely: Is said antidumping act in contravention of the Fifth Amendment to the Constitution in providing for a taking of property without due process of law? It is argued by counsel for the importer-appellant that it does, because it purports to authorize the Secretary of the Treasury to impose a penalty by an administrative order. No such claim is made if, in fact, such dumping duty be a tax and not a penalty.

Without assuming the correctness of either the premises or conclusion above stated, the legal character of dumping duties under said Anti-Dumping Act of 1921 will be examined.

The Act of May 27, 1921, 42 Stat. 11, of which said Anti-Dumping Act 1921, is a part, is entitled: "An Act Imposing temporary duties upon certain agricultural products to meet present emergencies, and to provide revenue; to regulate commerce with foreign countries; to prevent dumping of foreign merchandise on the markets of the United States; to regulate the value of foreign money; and for other purposes."

Title 2 of this general act (section 201 et seq. [19 USCA § 160 et seq.]) comprises the whole of the anti-dumping act. Parts of the act appear in a marginal note.[1] A care-

---

[1] "Sec. 201. (a) Whenever the Secretary of the Treasury (hereinafter called the 'Secretary'), after such investigation as he deems necessary, finds that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation into the United States of a class or kind of foreign merchandise, and that merchandise of such class or kind is being sold or is likely to be sold in the United States or elsewhere at less than its fair value, then he shall make such finding public to the extent he deems necessary, together with a description of the class or kind of merchandise to which it applies in such detail as may be necessary for the guidance of the appraising officers.

"(b) Whenever, in the case of any imported merchandise of a class or kind as to which the Secretary has not so made public a finding, the appraiser or person acting as appraiser has reason to believe or suspect, from the invoice or other papers or from information presented to him, that the purchase price is less, or that the exporter's sales price is less or likely to be less, than the foreign market value (or, in the absence of such value, than the cost of production) he shall forthwith, under regulations prescribed by the Secretary, notify the Secretary of such fact and withhold his appraisement report to the collector as to such merchandise until the further order of the Secretary, or until the Secretary has made public a finding as pro-

ful reading of the provisions of this act cannot fail to disclose that the object thereof is to authorize the Secretary of the Treasury, where dumping of foreign goods in the United States occurs, or is likely to occur, to set into operation machinery by which said merchandise will pay an equalizing duty, by means whereof industry in the United States will not be likely to be injured or be prevented from being established. The imposition which is to be made in such cases, which is denominated by the act (section 202 (a), a *"special dumping duty"* (italics ours), is an amount equal only to the difference between the purchase price or exporter's sales price, and the foreign-market value or cost of production, of the goods. In other words, it is an amount which will equalize values and put the importer and domestic industries upon a basis of equality.

Great care is provided to have such equalization do complete justice, as is to be seen by

a consideration of sections 202 (b) and (c), and sections 203, 204, 205, and 206, 19 USCA §§ 161 (b, c), 162–165. The four last-named sections do not differ materially from the administrative provisions of our laws for the ascertainment of values by appraisement.

In every case in which the matter is referred to, the special imposition is termed by the act a "duty." The same judicial remedies are given by appeals to the Board of General Appraisers, now the United States Customs Court, and to this court, as in other cases of the imposition of duties.

Counsel for the importer base their contention that the additional duties herein are penalties upon Helwig v. United States, 188 U. S. 605, 23 S. Ct. 427, 429, 47 L. Ed. 614. That case involved a construction of section 7 of the Customs Administration Act of 1890, 26 Stat. 131, 134, the disputed question being whether the additional imposition by the customs officers under said section constituted a

---

vided in subdivision (a) in regard to such merchandise.

"Sec. 202. (a) In the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary of the Treasury has made public a finding as provided in section 201 [section 160 of this title], and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the cost of production) there shall be levied, collected, and paid, in addition to the duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

"(b) If it is established to the satisfaction of the appraising officers that the amount of such difference between the purchase price and the foreign market value is wholly or partly due to the fact that the wholesale quantities, in which such a similar merchandise is sold or freely offered for sale to all purchasers for exportation to the United States in the ordinary course of trade, are greater than the wholesale quantities in which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), then due allowance shall be made therefor in determining the foreign market value for the purposes of this section.

"(c) If it is established to the satisfaction of the appraising officers that the amount of such difference between the exporter's sales price and the foreign market value is wholly or partly due to the fact that the wholesale quantities, in which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the United States in the ordinary course of trade, are greater than the wholesale quantities in which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), then due allowance shall be made therefor in determining the foreign market value for the purposes of this section.

"Sec. 208. In the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary of the Treasury has made public a finding as provided in section 201 [section 160 of this title], and delivery of which has not been made by the collector before such finding has been so made public, unless the person by whom or for whose account such merchandise is imported makes oath before the collector, under regulations prescribed by the Secretary, that he is not an exporter, or unless such person declares under oath at the time of entry, under regulations prescribed by the Secretary, the exporter's sales price of such merchandise, it shall be unlawful for the collector to deliver the merchan-

penalty. Said section provided, in substance, that if the appraised value of any article of imported merchandise should exceed by more than 10 per centum the value declared in the entry, there should be paid by the importer, "in addition to the duties imposed by law on such merchandise, a further sum equal to two per centum of the total appraised value for each one per centum that such appraised value exceeds the value declared in the entry." The section further provided that if the undervaluation exceeded 40 per centum, the entry should be held to be presumptively fraudulent and that the collector of customs might seize the same and proceed "as in cases of forfeiture for violations of the customs laws." The section also had a proviso "that all additional duties, penalties, or forfeitures" which were applicable to merchandise under a duly certified invoice, would also be applicable to those under a pro fórma invoice.

The Supreme Court, speaking through Peckham, J., held the imposition in that case to be in the nature of a penalty. It is to be noted that the amount of duty in that case amounted to $1,325.20. However, an additional exaction was imposed under the provisions of said section 7, amounting to $9,067.68. It is quite apparent, from reading the opinion of the Supreme Court, that the court had this excessive additional imposition in mind, as plainly indicative of the intent to penalize the importer, and called attention to the fact that the only difference between the provisions making a distinction between the amount of undervaluation below, and above, 40 per centum was to penalize the importer less if he, presumptively, was acting in good faith.

In the consideration of the matter, the court made this observation: "Although the statute, under section 7, supra, terms the money demanded as 'a further sum,' and does not describe it as a penalty, still the use of those words does not change the nature and character of the enactment. Congress may

---

dise until such person has made oath before the collector, under regulations prescribed by the said Secretary, that the merchandise has not been sold or agreed to be sold by such person, and has given bond to the collector, under regulations prescribed by the Secretary, with sureties approved by the collector, in an amount equal to the estimated value of the merchandise, conditioned: (1) That he will report to the collector the exporter's sales price of the merchandise within thirty days after such merchandise has been sold or agreed to be sold in the United States; (2) that he will pay on demand from the collector the amount of special dumping duty, if any, imposed by this title [sections 160 to 173 of this title] upon such merchandise; and (3) that he will furnish to the collector such information as may be in his possession and as may be necessary for the ascertainment of such duty, and will keep such records as to the sale of such merchandise as the Secretary may by regulation prescribe.

"Sec. 209. In the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary of the Treasury has made public a finding as provided in section 201 [section 160 of this title], and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, it shall be the duty of each appraiser or person acting as appraiser, by all reasonable ways and means to ascertain, estimate, and appraise (any invoice or affidavit thereto or state-

ment of cost of production to the contrary notwithstanding) and report to the collector the foreign market value or the cost of production, as the case may be, the purchase price, and the exporter's sales price, and any other facts which the Secretary may deem necessary for the purposes of this title [sections 160 to 173 of this title].

"Sec. 210. For the purposes of this title [sections 160 to 173 of this title], the determination of the appraiser or person acting as appraiser as to the foreign market value or the cost of production, as the case may be, the purchase price, and the exporter's sales price, and the action of the collector in assessing special dumping duty, shall have the same force and effect and be subject to the same right of appeal and protest, under the same conditions and subject to the same limitations; and the general appraisers, the Board of General Appraisers, and the Court of Customs Appeals shall have the same jurisdiction, powers, and duties in connection with such appeals and protests as in the case of appeals and protests relating to customs duties under existing law.

"Sec. 211. The special dumping duty imposed by this title [sections 160 to 173 of this title] shall be treated in all respects as regular customs duties within the meaning of all laws relating to the drawback of customs duties.

"Sec. 212. * * * This title may be cited as the 'Antidumping Act, 1921.'"
19 USCA §§ 160, 161, 167–171.

enact that such a provision shall not be considered as a penalty or in the nature of one, with reference to the further action of the officers of the government, or with reference to the distribution of the moneys thus paid, or with reference to its effect upon the individual, and it is the duty of the court to be governed by such statutory direction, but the intrinsic nature of the provision remains, and, in the absence of any declaration by Congress affecting the manner in which the provision shall be treated, courts must decide the matter in accordance with their views of the nature of the act. Although the sum imposed by reason of undervaluation may be simply described as 'a further sum' or 'an additional duty,' if it is yet so enormously in excess of the greatest amount of regular duty ever imposed upon an article of the same nature, and it is imposed by reason of the action of the importer, such facts clearly show it is a penalty in its intrinsic nature, and the failure of the statute to designate it as a penalty, but describing it as 'a further sum,' or 'an additional duty,' will not work a statutory alteration of the nature of the imposition, and it will be regarded as a penalty when by its very nature it is a penalty. It is impossible, judging simply from its language, to hold this provision to be other than penal in its nature."

The court also traced the history of the antecedent legislation on this subject, and, to a considerable degree, based its conclusions thereon.

In addition to the language above quoted, the Supreme Court in that case used this expression: "If it clearly appear that it is the will of Congress that the provision shall not be regarded as in the nature of a penalty, the court must be governed by that will."

Applying this rule to the case before us, we cannot escape the conviction that the expressed purpose of Congress, in the Anti-Dumping Act of 1921, was to impose not a penalty, but an amount of duty sufficient to equalize competitive conditions between the exporter and American industries affected, in order to carry out the manifest intent of this act, which was to provide revenue, to regulate commerce, and to prevent dumping and the consequent destruction of domestic industries.

The case of Lipke v. Lederer, 259 U. S. 557, 42 S. Ct. 549, 66 L. Ed. 1061, cited by counsel for importer, is not applicable here. That case involved a penalty imposed for a violation of section 35 of title 2 of the National Prohibition Act, chapter 85, 41 Stat. 305 (27 USCA §§ 52, 55). The said section

plainly stated that the imposition therein involved was a "penalty."

The Congress, at various times, and more especially so in recent years, has found it necessary to enact certain measures to regulate international trade and commerce, and to protect the industries of the country. The Anti-Dumping Act of 1921 is an example of such legislation. Equally so are the so-called flexible-tariff provisions of recent acts, such as section 315 of the Tariff Act of 1922, 42 Stat. 858, 941 (19 USCA § 154 et seq.). This section gave power to the President to put into effect increases of existing customs duties to a maximum of 50 per centum, for the purpose of equalizing the cost of production in this country and in the country of exportation. This power was sustained. Hampton, Jr. & Co. v. United States, 14 Cust. App. 350, T. D. 42030, affirmed in 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624.

Such provisions are not penal in their nature, but are rather intended to aid in the purposes expressed in the titles of said acts.

We are unable to see how the exaction of additional duty in this case differs, in principle, from that discussed by us in Bradford Co. et al. v. Amer. Lith. Co., 12 Cust. App. 318, T. D. 40318, and later in Lewis & Conger et al. v. United States, 13 Cust. App. 22, T. D. 40862. The statute involved in those cases was section 304 (a) of the Tariff Act of 1922, 42 Stat. 858, 936 (19 USCA § 132), the marking provision. This section provided for the exaction of an additional duty of 10 per centum of the appraised value of the imported merchandise which was not properly marked, stamped, branded, or labeled. In the latter case cited, the importers protested, as here, that the additional exaction was a penalty, and that its property was being taken without due process of law. This court held the exaction to be a duty, and that the Board of General Appraisers had complete jurisdiction.

It is argued that the language of section 211 of said act (19 USCA § 170), that the dumping duty should be considered as "regular customs duties," in drawback cases, indicates that the Congress was thus recognizing that, without this provision, these exactions would be treated, in all cases, as penalties. We conclude, rather, that this language indicates that the Congress desired and intended that the additional duties provided for in this act should be considered as duties for all purposes. No good reason is suggested why the Congress should have intended that the additional duties should be considered duties if

the goods were exported, and as penalties if they remained in the country.

We are of opinion that the additional sum collected by the collector in this case, pursuant to said dumping order, was and is an additional duty and not a penalty. It follows that the Anti-Dumping Act of 1921 is not repugnant to the provisions of said Amendment 5, as denying to the importer due process of law, and that the United States Customs Court did not err in sustaining its jurisdiction herein.

It is next contended that the dumping order issued herein was an order by Elmer Dover, Assistant Secretary, and was not the order of the Secretary of the Treasury.

In connection with this matter, Mr. Andrew W. Mellon, Secretary of the Treasury, was questioned on written interrogatories as to his participation in the issuance of said order. Mr. Mellon stated, in substance, that he was Secretary of the Treasury at the time said order was issued, and was familiar with the decision and the facts upon which it was based; that the words "By direction of the Secretary" were omitted from the printed copy by inadvertence, although they appear on the original copy; that an investigation as to whether the flour industry of the United States was likely to be injured by the importation of wheat flour from Canada was made by the Special Agency Service of the Treasury Department, in accordance with the practice of the Department, which investigations he regarded as sufficient; that reports of this investigation were addressed to him, and the said antidumping order was issued thereon. He further stated that the assistant secretaries of the Treasury, in accordance with the practice of his Department, were required to take up with the Secretary any and all matters requiring his personal action, and while he did not recall the details of what occurred in this transaction, that he did not doubt that Mr. Dover had discussed the facts of this case with him before the order was signed; that it had been seven years since this occurred; and that it was impossible for him to remember all the facts of all the transactions of his department during that period.

He further stated that this investigation, as all others of the kind, were made under the general regulations and procedure of his office; that the reports of all such investigations accompanied the findings of dumping when they came to him for signature; that he does not recall just what occurred at the time of signing this order; that he knows that an investigation was made as to suspected dumping of wheat flour before this order was issued; that he, by General Circular No. 244, signed by him on July 1, 1921, assigned the Customs Division to the Assistant Secretary of the Treasury, who is known within the Treasury as "Assistant Secretary in Charge of the Collection of the Revenues," and who was, at the time said order was issued, Mr. Elmer Dover; that all the assistant secretaries of the Treasury were given charge of all activities connected with such divisions, bureaus, or offices assigned to them, "subject to direction by the Secretary"; that Mr. Dover, as assistant secretary, was charged with the duty of taking such steps as might be necessary for the enforcement of the laws coming within the jurisdiction of the Customs Division, which included section 201 of the Anti-Dumping Act of 1921 (19 USCA § 160); that he does not recall whether he discussed said order with Mr. Dover before he signed the same. In connection with this testimony, a copy of said Department Circular No. 244 was introduced, which discloses that the Assistant Secretary in Charge of the Collection of the Revenues had charge of, and control over, the Customs Division.

We think the case is ruled by United States v. Central Vermont Railway Co., 17 C. C. P. A. (Customs) 166, T. D. 43474, and cases therein cited. There, as here, the authority of the Assistant Secretary, Mr. Dover, to make the dumping order in the case, was at issue. There was this difference in the two cases: In the Central Vermont Case, supra, the court relied upon the presumption of law that the order was issued by Mr. Dover in pursuance of authority granted him by the Secretary. Here, there is no need of such presumption. The testimony of the Secretary of the Treasury heretofore quoted, together with said Circular Letter No. 244, establishes, beyond question, such authority.

It is argued that the said testimony of the Secretary indicates that he had nothing to do, personally, with the investigation, and that this fact is evidenced by his failure to remember the details of the transaction. It would be strange, indeed, if one who had occupied the responsible position of Secretary of the Treasury, with its manifold duties, perplexities, and responsibilities, could remember, with exactness, after seven or eight years, the details of each of such transactions. Nor, in our opinion, is any such recollection of such details required. The Congress has provided for assistants to the Secretary, and has defined their duties, and has given the Secretary power to control the activities of those who assist him. In the nature of things,

 

it is physically impossible for any such official to personally transact all the details of his office. He must rely upon his assistants and those who aid him in the performance of his duties. In our opinion, the facts shown by this record are sufficient to sustain the issue of the antidumping order here involved.

We have held that in the performance of the responsible duty of issuing such orders the Secretary must keep within the law. He cannot delegate the duty of finding, in the first instance, that such an order should be issued to some officials, such as the customs officers at the ports. United States v. Tower & Sons, 14 Cust. App. 421, T. D. 42058. We have also held that he may not issue such orders through some one in his office who was not charged by him with such duty, and which duty did not appertain by law to his office. United States v. Prym, 17 C. C. P. A. (Customs) 180, T. D. 43475. However, no such facts exist here.

■ Counsel for importer urge that the trial court and the chief justice thereof erred in refusing to transfer the cause to Washington for hearing. This was a matter of discretion, which discretion we are unable to say has been abused. United States v. Enrique Vidal Sanchez, 15 Cust. App. 443, T. D. 42642.

■ The action of the trial court in sustaining objections to certain written interrogatories addressed to the witness Mellon is assigned as error. We have examined these interrogatories. In our opinion, the objections were properly sustained as to said interrogatories 10, 11, 12, 13, and 15. Interrogatories 6 and 17 would seem to be unobjectionable. However, the ground covered by the sixth is fully covered by the answers to the allowed interrogatories, and the sustaining of the objections to these questions does not, in our judgment, constitute reversible error.

We conclude that the judgment of the United States Customs Court is without error, and it is affirmed.

GARRETT, Associate Judge (specially concurring).

I concur in the conclusion reached in these consolidated cases, and am in general agreement with the statement of facts and the reasoning of the opinion. Consequently I concur specially only to state that appellant C. J. Tower & Sons, in their assignments of error, have here questioned the constitutionality of the Anti-Dumping Act of 1921 solely upon the grounds: (a) That it provides for the taking of property without due process of law because the duties provided therein are claimed to be penal in character, and (b) that the duties "are not uniform throughout the land."

I feel that these assignments of error are not well taken, but have given no consideration to any other theories respecting the constitutionality of the act, because, as presented before this court, such consideration was not required.