**NATIONAL LABOR RELATIONS BOARD v. BOTANY WORSTED MILLS, Inc.**

**BOTANY WORSTED MILLS v. NATIONAL LABOR RELATIONS BOARD.**

Nos. 6708, 6890.

Circuit Court of Appeals, Third Circuit.
Aug. 3, 1939.

264

Charles Fahy, General Counsel, Robert B. Watts, Associate General Counsel, Laurence A. Knapp, Mortimer B. Wolf and Samuel Edes, all of Washington, D. C., for National Labor Relations Board.

Putney, Twombly & Hall, of New York City (Louis H. Hall, Lemuel Skidmore, and Frederic R. Sanborn, all of New York City, of counsel), for Botany Worsted Mills.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

In 1757 the British public was profoundly shocked at the sentence of death imposed by a naval court martial upon Admiral Byng "pour encourager les autres" for his "negligent" conduct at the siege of Minorca. This decision was considered so harsh that a bill passed the House of Commons releasing the members of the court martial from their oath of secrecy in order that an investigation might be had. But the bill was defeated in the House of Lords, due to the efforts of Lords Hardwicke and Mansfield. According to the biographer of the former:

"* * * They treated the subject with judicial accuracy and precision, showing that criminal justice could not be administered satisfactorily by any tribunal in the world if there were to be a public disclosure of the reasonings and observations of those who are to pronounce the verdict or judgment while they are consulting together". Campbell, Lives of the Lord Chancellors, Vol. V, Chapter 136, p. 141.

Counsel in the case at bar urge us to order (by issuance of interrogatories under plea of denial of fair hearing) somewhat similar public disclosures from members of the National Labor Relations Board, who have consulted together to pronounce a judgment adverse to the petitioner, their client.

In considering the question thus raised we are, unfortunately, without benefit of the precise points used by the two learned Lords in persuading Parliament to let Byng go to his death. See 15 Parl. Hist. 803–822. Other jurists have, however, exhibited a corresponding reluctance to pry into the doings of triers of fact. It is said, for instance, that jurors are privileged from disclosing their arguments, votes and other media concludendi, in order that their freedom of debate and independence of thought may be safeguarded, Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993; 2 Wigmore on Evidence § 2346. The same result is reached by application of the parole evidence rule to the verdict, 2 Wigmore on Evidence § 2348. Furthermore, a juror's inability to impeach his verdict presents an almost complete barrier to inquiry and is based upon persuasive reasons of policy. As the Supreme Court has put it: "* * * If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict. But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference". McDonald v. Pless, 238 U.S. 264, 267, 268, 35 S.Ct. 783, 784, 59 L.Ed. 1300.

What we have written and quoted serves to indicate the character of the policy. It is directed against "conviction out of their own mouths" only. Thus evidence of defective deliberation has been considered proper if offered aliunde. The happenings of the jury room are not sacred if heard through the keyhole or observed through the transom, Wilson v. Berryman, 5 Cal. 44, 46, 63 Am.Dec. 78; Houk v. Allen, 126 Ind. 568, 569, 25 N.E. 897, 11 L.R.A. 706; Wright v. Abbott, 160 Mass. 395, 36 N.E. 62, 39 Am.St.Rep. 499; Bradt v. Rommell, 26 Minn. 505, 5 N.W. 680; Boynton v. Trumbull, 45 N.H. 408, and see

Vaise v. Delaval, 1 T.R. 11; Burgess v. Langley, 5 Man. & G. 722. A fortiori a juror's incapacity whether deafness, ignorance of the language, sleep or intoxication can be shown, Zimmerman v. Carr, 59 Ind. App. 245, 109 N.E. 218; Com. v. Jones, 12 Phila. 550; McCampbell v. State, 9 Tex. App. 124, 35 Am.Rep. 726; Shaw v. Fisk, 21 Wis. 368, 369, 94 Am.Dec. 547; 12 A.L.R. 663; 34 A.L.R. 194; 46 C.J. 145.

■ Does this policy against "internal" evidence of how the wheels of judicial machinery go around apply with equal or perhaps greater force to the judicial function of an administrative board? We think it does. In saying so we take note of a division in the authorities, pro—National Labor Relations Board v. Biles Coleman Lumber Co., 9 Cir., 98 F.2d 16; Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 103 F.2d 953; Inland Steel Co. v. National Labor Relations Board, 7 Cir., 105 F.2d 246, decided June 21, 1939; con—C. J. Tower & Sons v. United States, Cust. & Pat.App., 71 F.2d 438 (Secretary of the Treasury); Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (Secretary of Agriculture); National Labor Relations Board v. Cherry Cotton Mills, 5 Cir., 98 F.2d 444, 449, 1021. We believe that the dissent arises from the failure of the courts to observe a distinction indicated by the ratio decidendi of the cases we have previously cited and quoted from. But before proceeding to a fuller exposition of that distinction we must touch upon another, also often overlooked. That is the difference between the essential characteristics of the "fair hearing" itself and the method of ascertaining the presence or absence of those essentials. In the case at bar many of the inquiries are directed to the non-essentials of due process.

■ We may conveniently divide the interrogatories sought into four categories. They are those touching upon (1) the reading of the record, (2) the reading of the trial examiner's report and the exceptions thereto, (3) the preparation of the Board's decision, and (4) the ex-parte hearing of the Board's own counsel. It is both obvious and well settled by authority that the one who decides must hear or, in the case of written testimony, read, Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288, above cited. The United States Supreme Court does not seem to share the cynicism of a writer in the Yale Law Journal who said: "* * * No one

has dared suggest that litigants may impeach the decision of judges of intermediate appellate courts on the ground that they had not read the record made before a lower court. No lawyer is naive enough to believe that judges actually read through the records in the cases before them". Feller, Prospectus For The Further Study Of Federal Administrative Law, 47 Yale Law Journal 646 at 664.

As the question here, then, is one of method of ascertainment only, we postpone our discussion thereof and proceed with the three other alleged denials of due process.

■ The reading or failure to read the trial examiner's report and the exceptions thereto is relevant only to the question of argument. Petitioner argued before the trial examiner but did not argue before the Board. In this respect the case at bar differs from the Biles Coleman, Cherry Cotton Mills, Cupples, and Inland Steel cases, where oral argument was had before the Board. Yet petitioner neither alleges nor could allege (since the Board quoted from its brief submitted to the trial examiner) that it was denied a written argument or that it requested any argument at all. That being so, it is impossible to discern any denial of due process, National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 287, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406; National Labor Relations Board v. American Potash & Chemical Corp., 9 Cir., 98 F.2d 488. We are correspondingly not required to consider the perplexing problem of whether argument to the Board itself (the statute, 29 U.S.C.A. § 160, is silent as to written argument, providing only for discretionary oral argument) is a constitutional necessity or merely a legalistic luxury. Compare National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 47, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, with Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288, and Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, above cited. See, also, Handler, The Morgan Case And The National Labor Relations Board, Commerce Clearing House, Labor Law Com-

ments, No. 5; Judicial Control of Administrative Procedure: The Morgan Cases, 52 Harvard Law Review 509 (note); Feller, Prospectus For The Further Study Of Federal Administrative Law, 47 Yale Law Journal 646, above cited; Oppenheimer, The Supreme Court And Administrative Law, 37 Columbia Law Review 1, 33–37; Fraenkel, Constitutional Issues In The Supreme Court, 1937 Term, 87 University of Pennsylvania Law Review 50; 63; Implications Of The Second Morgan Decision, 33 Illinois Law Review 227; 38 Columbia Law Review 1279, 1282 (note); 37 Michigan Law Review 597, 602–605 (Comment).

■ We feel that the inquiry into the mechanics of opinion-writing is ethical rather than legal. The standard that frowns upon plagiarism, or, if commercialized, forbids it, applies to all writing and not only to the literary efforts of judicial officers. We have gone beyond the practice of ancient Rome where the copyright could be protected only by writing another poem.

"Fidentinus, by stealing my verse
As a poet you hope to be known?
That's the way Aegle thinks she has teeth,
Though her mouth's filled with iv'ry and bone".

Martial, Epigrams (Nixon's trans. 1911) 72.

Because, however, a particular writer with or without acknowledgment adopts the exact or substantial phraseology of others, it does not follow that he has abdicated in favor of mental processes extrinsic to his own. The frequent affirmation by an appellate court on the opinion of the court below is an instance. That practice, though of possible annoyance to industrious counsel, Bruce, The American Judge, p. 76, has never, to our knowledge, been challenged on constitutional grounds. A writer in the Columbia Law Review suggests another analogy in the adoption by a judge of material prepared by his law clerk, 38 Columbia Law Review 1279, 1282 (note), above cited; cf. United States v. Standard Oil Co. of California, D. C., 20 F.Supp. 427, 450. A less pleasant illustration might be found in a comparison of the opinions of some courts with the briefs of counsel. We may add that the Labor Board has never made any mystery of the part taken by the attorneys in its "Review Division" in aiding it in writing its opinions, Gelhorn and Linfield, Politics and

Labor Relations, 39 Columbia Law Review 339 at pages 384, 385; Madden, Administrative Procedure; National Labor Relations Board, 45 West Virginia Law Quarterly 93, 96.

■ We think it unfortunate that questions directed to the participation of Mr. Midonick in the proceeding have the effect of casting aspersions upon his integrity. If in fact he was of counsel in the prosecution of the cause and the Board heard him ex-parte, the absence of due process would be conceded and the method of its proof would come under our discussion of that point. Indeed, even that would seem unnecessary in view of the ease of ascertaining that fact aliunde or, in other words, by the testimony of Mr. Midonick in open court—a procedure which would afford that gentleman the fair hearing petitioner desires for itself. However, the petitioner by its own pleadings and supporting affidavit has made this issue no longer relevant. For it appears from those documents that Mr. Midonick did not act as counsel before the trial examiner, but rather in some other capacity disconnected with the prosecution of the case. Insofar as is alleged, he may well have been a member of the "Review Division" above referred to. Compare Morgan v. United States, 304 U.S. 1, 22, 58 S.Ct. 773, 999, 82 L.Ed. 1129.

■ We return, then, to the method of inquiry into the one essential of due process lacking if the facts are as claimed. The Supreme Court has given this method its sanction in the case of one executive officer, Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288, above cited; Morgan. v. United States, 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129, above cited. Even there, that august body seems to have had some qualms. It permitted the fact, but denied its exploitation, saying: "In the light of this testimony there is no occasion to discuss the extent to which the Secretary examined the evidence, and we agree with the Government's contention that it was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions if he gave the hearing which the law required". Morgan v. U. S., 304 U.S. 1, at page 18, 58 S.Ct. at page 776, 82 L.Ed. 1129, above cited.

By way of contrast, in McDonald v. Pless, above cited, the Supreme Court had

already upheld the right of privacy of a deliberative body. These two decisions of the high court thus establish that the cogitations of one person and the deliberations of more than one are not only different in fact, but distinguishable in law. The interrogation of a single judge may be futile; if he is aware of the obligations of the judicial function, he is unlikely to fail in their performance. If, on the other hand, he is of the type and caliber that fails to recognize or neglects to undertake them, he is, by the same token, quite unlikely to admit it. Nevertheless the inquiry itself, though more than probably sterile, is, we think, harmless. Unlike the mayhap equally sterile inquiry into the plural judicial process, it does not encroach upon the right of privacy of mutual deliberation.

The essence of the discussion of a common cause and the judgment ensuing upon that discussion must lie in freedom of expression. If those present during the discussion are aware that their sentiments, either tentative or final, may be revealed by their fellow participants, it is clear that caution or worse would remove all candor from their minds and tongues. The logic of this position requires the preservation from questioning of each member of the general body. Each one's action or reaction is part of the common pool; to cast suspicion upon anyone of them is to muddy the general waters. To illustrate simply, if Mr. X is asked, "Did you read the record?", what is to prevent his fellow member, Mr. Y, from being asked, "Did Mr. X act as if he had read the record?"; and so ad infinitum. Thus the freedom of deliberation is indirectly restrained.

We are glad, therefore, to ensure to members of the Labor Board the same protection accorded to jurors since the 18th Century. In so doing we do not disregard the fact that the Board is commanded by statute to act as prosecutor as well as judge, and to appear in this Court as a party litigant, 29 U.S.C.A. § 160. See Wolf, Administrative Procedure Before The National Labor Relations Board, 5 University of Chicago Law Review 358; Cushman, Constitutional Status Of Independent Regulatory Commissions, 24 Cornell Law Quarterly 13, 163; Stason, Administrative Tribunals: Organization And Reorganization, 36 Michigan Law Review 533. Jaffe, Invective And Investigation In Administrative Law, 52 Harvard Law Review 1201. Historically, the early English method of appeal was similar, i. e., by way of a semi-criminal proceeding against the trial judge. Historically again, it would seem that the judge was then, as probably now, immune from inquiry by virtue of the unimpeachability of his court records, Holdworth, History of English Law, Vol. 1, p. 213; 3 Blackstone's Commentaries, §§ 24, 405. As a matter of policy and not of history, we think that efficient deliberation by a quasi-adversary, such as the Labor Board, is even more necessary than efficient deliberation by a neutral, such as a judge or a jury. Furthermore, since the litigants before the Labor Board are legion, the evil of harassment referred to by the Supreme Court in McDonald v. Pless above cited, is correspondingly multiplied. The function of deciding controversies might soon be overwhelmed by the duty of answering questions about them.

When one comes to consider the record itself and the conclusions which the Labor Board deduces therefrom, one wonders at the insistent desire of counsel to inquire into the methods whereby those conclusions were reached. In view of what appears to be their conception of the judicial practice, we are somewhat nervous about stating that we have read the record. That does happen to be the fact and we may say that our reading gives us an impression of the faithful performance of duty by the members of the Labor Board. We are, it is true, constrained to disagree with them in two aspects of the case and are thus brought to the recital of what we read in the record.

In the early part of April 1937, the Textile Workers Organizing Committee, a labor organization affiliated with the C.I.O., launched a membership drive among petitioner's employees. Of those who joined, four (Peidl, Stramiello, Kozak, and one other) were asked by petitioner's foreman whether they belonged to the C.I.O. With one exception, these inquiries seem to have been in the form of a simple question, and were followed by an affirmative answer, with nothing more said, Record 99, 222. The exception is an interview between Belli, the assistant head of petitioner's combing department, and Stramiello. It is described by the latter as follows: "He said, 'I heard you are very interested in the CIO'. I said, 'What makes you say so?'

He said, 'Well, the Labor Board is watching you very closely and they know what you are doing. You actually speak in public places on Union activities, which I see'. I cut him short and said, 'What is the use of kidding me, or kidding yourself?' I said, 'Why don't you bring in the man who told you this? So far as I am concerned you do not have to fire me, I will walk out willingly'. He said, 'Well, I will have to look into the matter and let you know about this'. That is all that was said". Record, 240, 241.

One of petitioner's employees, Pieczarka, was opposed to labor unions and strikes of any kind, Record 293. On Monday, April 27, he observed Peidl receiving a signed union application card from Kozak during the night shift. A few hours later, just before the shift ended, he asked Peidl to sign him up with the Textile Workers Organizing Committee. Peidl refused, Record 86, cf. Record 278. The next morning Pieczarka told Remig, the general manager of petitioner's personnel department, that Peidl was signing up the men on company time, Record 285-292. Thereafter on May 1, a friend of Peidl's overheard Leightle, a foreman, conversing with Pieczarka: "George Leightle asked Monkey, 'Did Joe want to sign you up?' Monkey said, 'Yes'. George Leightle said, 'That is all Mr. Belli wants to know'". Nagy, Record 176.

That afternoon Peidl was discharged. The official reason given was that he had been using company time for purposes other than the performance of his allotted tasks, Record 248. On the other hand, Remig and two foremen were quoted as ascribing Peidl's discharge to his union activity, Record 94, 178, 179, 280. Moreover, the employees in petitioner's combing department where Peidl worked were, for, one reason or another (mostly technological), not required to be busy during several fifteen to twenty minute intervals in each eight hour shift, Record 88, 151, 212, 223, 231. At these times they ate (no regular lunch hour seems to have been provided in petitioner's operating schedule), Record 87, 88, 212, 224, talked together, Record 89, 166, 212, 218, 231, and sold tickets for lotteries, dances, raffles, basket-ball games, etc., Record 146-151, 169-174, 231-234. Such extra-curricular activities on company time had never been invoked by petitioner as a cause for discharge, Record 253.

■ In these occurrences, the Board discerned two unfair labor practices. The first consists of interference, restraint and coercion of employees in the exercise of their rights of collective bargaining, etc., 29 U.S.C.A. §§ 157, 158(1). The Board deduced this finding from three distinct courses of employer conduct, "persistent questionings", "threats both express and implied" and "espionage", the last being, of course, the most serious and in our opinion the most doubtful. Our recital of facts includes what we deem to be several instances of questionings and implied threats, one plain, the others only superficially less alarming. On the other hand, we do not think that Mr. Pieczarka's tale-bearing sinks to the level of industrial espionage. He testified (in reply to questions put by the trial examiner) that he acted of his own accord, and not in compliance with petitioner's instructions, Record 286, 287. Indeed the only reflection on his amateur status appears in his overheard conversation with Leightle, which we have quoted. Under the circumstances, we do not regard that conversation as substantial evidence. Nor can we be won over to the Board's contention that by merely listening to, and acting upon, Mr. Pieczarka's apparently isolated report, Record 139, petitioner was guilty of spying. The cases condemning labor espionage reflect a far more insidious circumstance, Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (employment of detective agency); National Labor Relations Board v. Fruehauf Trailer Co., 301 U.S. 49, 54, 57 S.Ct. 642, 630, 81 L.Ed. 918, 108 A.L.R. 1352 (employment of detectives); Agwilines, Inc., v. National Labor Relations Board, 5 Cir., 87 F.2d 146 (attempted employment of likely candidate for union presidency). See, also, Employer Interference With Lawful Union Activity, 37 Columbia Law Review 816, 838-841, note.

■ The second unfair practice found—Peidl's discriminatory discharge, 29 U.S.C. A. § 158(3)—is amply supported by evidence. Petitioner's excuse that knowledge of the unpunished sumptuary activities of its employees on company time (of which proof is allegedly lacking) was vouchsafed it only through the medium of the trial examiner's hearing, impresses us as being at best a specious afterthought. For the rest we think it sufficient to cite Ward, Proof Of Discrimination Under The National Labor

Relations Act, 7 George Washington Law Review 797. None of the defects in proof criticized in that article are present here.

In ordering Peidl's reinstatement (without back pay), the Board was careful to make a special finding that he had not obtained other "substantially equivalent employment", 29 U.S.C.A. § 152(3), cf. Mooresville Cotton Mills v. National Labor Relations Board, 4 Cir., 94 F.2d 61, on rehearing, 97 F.2d 959. In fact, however, Peidl secured a steady job as a Textile Workers' Organizing Committee organizer immediately after his discharge. His pay was 40¢ a week less than that which he had been receiving from petitioner. The only other difference between the two jobs disclosed by the record appears in Peidl's preference. He wishes to resume employment with petitioner. The Board seems to feel this fact is "partly" controlling, Record 338. We question this. The choice is between two innocent parties, Mr. Peidl, the victim of an unfair labor practice, and Mr. X, the employee who in good faith has replaced him. That being so, it seems to us that lack of equivalence must be discovered in realms more material than the mind and sensibility of one of the individuals concerned. Accordingly, we follow the course of the court in Mooresville Cotton Mills v. National Labor Relations Board, above cited, and remand this matter for further proof before the Board. It may be that the material conditions of the two types of employment such as place, distance, hours, tenure, prestige, seniority, possibility of advancement, etc., are different, but see 52 Harvard Law Review 1365. Of this, we are not presently advised.

The petition for the issuance of interrogatories to the members of the National Labor Relations Board by them to be answered under oath and to be returned to this court is denied. The order of the National Labor Relations Board is modified by striking therefrom clause (b) of paragraph 1 and clause (a) of paragraph 2 thereof and its enforcement as so modified will be decreed. The record is remanded to the National Labor Relations Board for a further determination, in accordance with the views expressed in this opinion, of the matter of whether Joseph Peidl has since his discharge by petitioner obtained other regular and substantially equivalent employment.