**NATIONAL KNITWEAR & SPORTS-WEAR ASSOCIATION, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Peninsula Knitters Ltd. and Fang Brothers Knitting Ltd., Defendants–Intervenors.**

**Court No. 90–10–00537.**

United States Court of International Trade.

Nov. 15, 1991.

Gibson, Dunn & Crutcher, Donald Harrison and Judith A. Ott, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis, Thomas G. Ehr, of counsel, Atty. Advisor, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., for defendant.

Grunfeld, Desiderio, Lebowitz & Silverman, Bruce M. Mitchell, Max F. Schutzman and David L. Simon, New York City, for defendants-intervenors.

## MEMORANDUM OPINION AND ORDER

CARMAN, Acting Chief Judge:

Plaintiff seeks review of the final determination of the International Trade Administration, United States Department of Commerce, entitled, *Final Determination of Sales at Less Than Fair Value: Sweaters Wholly or in Chief Weight of Man–Made Fiber from Hong Kong,* 55 Fed.Reg. 30,733 (July 27, 1990) (*"Final Determination"*). Pursuant to Rule 56.1 of the Rules of this Court, Plaintiff seeks judgment upon the agency record regarding Commerce's action in excluding the affirmative dumping margin rate assigned to Prosperity, one of the respondents in the underlying investigation, in the "all others" rate. Defendant seeks to sustain the *Final Determination* as supported by substantial evidence on the record and otherwise in accordance with law. Defendant–Intervenors, Hong Kong manufacturers and exporters of the subject merchandise, join Defendant.

## BACKGROUND

On September 22, 1989, National Knitwear & Sportswear Association ("NKSA") filed a petition concurrently with the United States Department of Commerce ("Commerce" or "Department") and the United States International Trade Commission ("Commission") for an antidumping investigation of sweaters made wholly or in chief weight of man-made fiber ("MMF sweaters") from Hong Kong, Taiwan, and the Republic of Korea. NKSA alleged that the imported sweaters were being, or were likely to be, sold in the United States at less than fair value and were materially injuring, or threatening material injury to, a United States industry. The case before this Court is limited to the investigation of MMF sweaters from Hong Kong.

The Department initiated an antidumping investigation of MMF sweaters from Hong Kong on October 19, 1989. *Initiation of Antidumping Duty Investigations: Sweaters Wholly or in Chief Weight of Man–Made Fiber from Hong Kong, the Republic of Korea, and Taiwan,* 54 Fed. Reg. 42,972 (Oct. 19, 1989). On April 27, 1990, the Department published its preliminary determination finding that the subject sweaters from Hong Kong were being sold in the United States at less than fair value. *Preliminary Determination of Sales at Less Than Fair Value; Sweaters Wholly or in Chief Weight of Man–Made Fiber from Hong Kong,* 55 Fed.Reg. 17,775 (Apr. 27, 1990). The preliminary determination was subsequently amended to correct a clerical error. *Amendment to Preliminary Determination of Sales at Less Than Fair Value; Sweaters Wholly or in Chief Weight of Man–Made Fiber from Hong Kong,* 55 Fed.Reg. 19,289 (May 9, 1990). On July 27, 1990, the Department published its final determination of sales at less than fair value. *Final Determination,* 55 Fed.Reg. at 30,733. On September 24, 1990, following an affirmative injury

determination by the Commission, *Sweaters Wholly or in Chief Weight of Man–Made Fibers from Hong Kong, the Republic of Korea, and Taiwan,* USITC Pub. 2312, Inv. Nos. 731–TA–448–450 (Final) (Sept.1990), the Department published an antidumping duty order covering man-made fiber sweaters from Hong Kong. *Antidumping Duty Order: Sweaters Wholly or in Chief Weight of Man–Made Fiber from Hong Kong,* 55 Fed.Reg. 39,-035 (Sept. 24, 1990).

In the *Final Determination,* the Department found that MMF sweaters from Hong Kong, except those of Crystal Knitters, Ltd. ("Crystal") and Laws Fashion Knitters, Ltd. ("Laws"), were being, or were likely to be, sold in the United States at less than fair value during the period of investigation. 55 Fed.Reg. at 30,733. The overall weighted-average dumping margins for two respondents, Crystal and Laws, were considered zero and *de minimis* respectively, so that sweaters produced in Hong Kong by these respondents were excluded from the antidumping duty order. *See* 19 C.F.R. §§ 353.21(c), 353.6(a). The final dumping margin determined by the Department for the third respondent, Comitex Knitters, Ltd. ("Comitex"), was 5.86 percent. 55 Fed.Reg. at 30,744. The fourth respondent, Prosperity Clothing Co., Ltd./Estero Enterprises, Ltd. ("Prosperity") was assigned a final dumping margin of 115.15 percent. *Id.*

In addition to calculating the antidumping margins for the respondents, Commerce must also calculate an "all others" rate for the remaining firms that were not investigated. In this case, for reasons set forth below, Commerce applied Comitex' 5.86 percent antidumping margin to the "all others" rate and excluded Prosperity's 115.15 percent final dumping margin from this calculation. Plaintiff challenges Commerce's decision to include Prosperity's affirmative dumping margin, which was based on best information available, in the calculation of the "all others" rate.

## STANDARD OF REVIEW

Pursuant to the Tariff Act of 1930 ("Act"), in reviewing a final determination of the International Trade Administration, this Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). When applying the substantial evidence standard " '[t]he court may not substitute its judgment for that of the [agency] when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo....* ' " *American Spring Wire Corp. v. United States,* 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom. Armco, Inc. v. United States,* 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985) (quoting *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464).

■ In determining whether to sustain the agency's construction of the antidumping statute or regulations, the Court need not find the agency's interpretation to "be the *only* reasonable interpretation or the one which the court views as the most reasonable." *ICC Indus., Inc. v. United States,* 5 Fed.Cir. (T) 78, 85, 812 F.2d 694, 699 (1987) (citing *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.,* 3 Fed.Cir. (T) 83, 90, 753 F.2d 1033, 1039 (1985). Moreover, judicial review of the agency determination is limited. *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (1990). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Id.* (citations omitted).

■ In addition, where, as in the instant case, the statute does not provide explicit

guidance on a particular issue, the agency acts within its discretionary authority to interpret the intention and purposes of the law. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978). "The question is thus whether, in light of the normal aids to statutory construction, the Department's interpretation is 'sufficiently reasonable' to be accepted by a reviewing court." *Id.* (citing *Train v. Natural Resources Defense Council*, 421 U.S. 60, 75, 95 S.Ct. 1470, 1480, 43 L.Ed.2d 731 (1975); *American Lamb Co. v. United States*, 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986). In *American Lamb*, the Court stated:

> A reviewing court must accord substantial weight to an agency's interpretation of a statute it administers. Though a court may reject an agency interpretation that contravenes clearly discernible legislative intent, its role when that intent is not contravened is to determine whether the agency's interpretation is 'sufficiently reasonable.' The agency's interpretation need not be the only reasonable construction or the one the court would adopt had the question initially arisen in a judicial proceeding.

4 Fed.Cir. (T) at 54, 785 F.2d at 1001 (citations omitted).

## DISCUSSION

### *The Methodology Employed by Commerce*

The Department's antidumping investigations are based on questionnaires sent to a number of foreign producers requiring that these producers (and related importers) provide information covering their sales during the Department's period of investigation which is normally the period five months before and one month after the first day of the month in which the petition was filed. *See* 19 C.F.R. § 353.42(b) (1990). The Department's antidumping regulations further provide that the Department "normally will examine not less than 60 percent of the dollar value or volume of the merchandise sold" during the period of investigation. *Id.*

However, in the instant case, it is undisputed that the Department did not follow its normal practice of sending questionnaires to foreign producers accounting for "not less than 60 percent" of sales during the period of investigation. Instead, the Department sent questionnaires to only four Hong Kong companies that the Department identified as the major quota holders to export MMF sweaters from Hong Kong to the United States during the period of investigation. The four respondents were Comitex Knitters, Ltd. ("Comitex"), Crystal Knitters, Ltd. ("Crystal"), Laws Fashion Knitters, Ltd. ("Laws"), and Prosperity Clothing Co., Ltd./Estero Enterprises, Ltd. ("Prosperity").

The antidumping law allows Commerce to depart from normal procedure when a significant volume of sales is involved or a significant number of adjustments to prices is required by employing averaging or generally recognized sampling techniques. 19 U.S.C. § 1677f–1(a) (1988). In this case, the Department departed from the normal practice of investigating "not less than 60 percent" of the dollar value or volume of sales because of the large number of manufacturers and exporters in each country that would be necessary to achieve 60 percent coverage. *Preliminary Determination*, 55 Fed.Reg. at 17,775.

Moreover, the Department determined that due to the lack of industry-specific information on the record, the Department would be unable to develop a representative sample. *Id.* Consequently, the Department decided not to limit the selection of respondents by sampling. Instead, due to statutory deadlines, the Department limited its analysis by investigating only those companies accounting for the top 30 percent of the total 1989 "quota allocations" among Hong Kong exporters of the subject merchandise rather than the "normal" 60 percent of exports to the United States as stated in 19 C.F.R. § 353.42(b). *See Final Determination*, 55 Fed.Reg. at 30,736–37.

This presented a further departure from the regulations because the Department normally bases respondent selection on shipments or sales to the United States

during a given period of time. However, in this case, because the data available to the Department regarding shipments to the United States was qualified and incomplete, the Department based respondent selection on "quota allocations," which was "the only complete information available at that time." *Id.* at 30,736.

The antidumping law also requires the Department to "verify all information relied upon" in its final determinations in antidumping investigations and further requires the Department to "report the methods and procedures used to verify such information." 19 U.S.C. § 1677e(b) (1988). In adding these verification requirements to the law in 1979, Congress indicated that the requirements were intended to address "[n]umerous complaints ... made regarding the current practices on verification of information submitted to the Department of the Treasury in antidumping and countervailing duty proceedings," and that if the "information cannot be verified, the administering authority must then use the best information available in making its determination." S.Rep. No. 249, 96th Cong., 1st Sess. 98, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 484.

In the present action, the Department's investigation was marked by several developments relating to the verification and certification requirements for one of the four respondents selected by the Department, specifically Prosperity. Two days before the scheduled verification, the United States counsel for Prosperity informed Commerce officials that Prosperity, for reasons not explained, would not permit verification of any of the information that counsel had submitted to the Department on behalf of Prosperity and that the law firm representing Prosperity was withdrawing as counsel for Prosperity.

Because Prosperity did not permit verification of any of its submissions, the Department decided pursuant to the antidumping law to "use the best information available to it as the basis for its" final determination. 19 U.S.C. § 1677e(b); *see* 19 C.F.R. § 353.37 (1990). The antidumping law further provides that the best information available may include "the information submitted in support of the petition." 19 U.S.C. § 1677e(b). In this case, the Department determined that the best information available on the margin for Prosperity was the highest margin alleged in the petition, that is, 115.15 percent. 55 Fed.Reg. at 30,734.

In addition to calculating the final dumping margins for the four respondents subject to the investigation, the Department also calculated the "all others" rate. This "all others" rate is the basis of the estimated antidumping duties that importers of the subject merchandise produced by all companies other than the specific respondents must deposit when the merchandise is entered into the United States. *See* 19 U.S.C. § 1673e(b)(1) (1988). It is the Department's general practice to calculate the "all others" rate as a weighted average of all affirmative antidumping margins, including those based on the best information available, excluding only respondents with zero or *de minimis* margins. *See* 55 Fed. Reg. at 30,738. In this case, however, the Department calculated the "all others" rate at 5.86 percent, equal to the dumping margin calculated for Comitex, without including the affirmative dumping margin of 115.15 percent determined for Prosperity. *Id.* at 30,744.

This Court must determine whether the Department's action in excluding the affirmative dumping margin assigned to Prosperity, based on best information available, in its calculation of the "all others" rate was proper.

■ The statute does not prescribe the methodology by which the Department is directed to calculate the "all others" rate. Section 736 of the Tariff Act of 1930 ("Act"), *as amended,* 19 U.S.C. § 1673e(a)(1) (1988), provides that an antidumping duty order shall

> direct[ ] customs officers to assess an antidumping duty equal to the amount by which the foreign market value of the merchandise exceeds the United States price of the merchandise....

Section 735 of the Act, *as amended,* 19 U.S.C. § 1673d(a)(1) (1988), governing final

antidumping determinations, states that the Department shall

> make a final determination of whether the merchandise which was the subject of the investigation is being, or is likely to be, sold in the United States at less than its fair value.

Moreover, the legislative history [1] and the Department of Commerce antidumping regulations are also silent as to the method of calculating the "all others" rate.[2] Therefore, because neither the statute nor the regulations provides any explicit methodology by which the Department is required to calculate the "all others" rate, the methodology used in a particular case is subject to the discretion of the Department.

This Court, in its review of the methodology employed by the Department, must determine if the manner in which the Department calculated the "all others" rate was reasonable. In applying this standard, the Court has stated that:

> As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.

*Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–05, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted).

When an agency relies on its methodologies and procedures, it "must either follow its existing precedents or provide a reasonable explanation for its deviation or noncompliance." *Western Conference of Teamsters v. Brock,* 13 CIT ——, 709 F.Supp. 1159, 1169–70 (1989), quoting *ILWU Local 142 v. Donovan,* 9 CIT 620, 625, 1985 WL 6154 (1985), *reh'g denied,* 10 CIT 161, 1986 WL 30016 (citing *Secretary*

*of Agriculture v. United States,* 347 U.S. 645, 653, 74 S.Ct. 826, 831, 98 L.Ed. 1015 (1954)); *NTN Bearing Corp. of America v. United States,* 14 CIT ——, 747 F.Supp. 726, 736 (1990). In *NTN Bearing* the Court further articulated this standard in stating that

> Commerce has traditionally been granted broad discretion in the selection of methodology implemented to achieve its mandate. Hence, absent a showing of unreasonableness on the part of the agency, its choice of methodology shall be sustained. *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–05, 636 F.Supp. 961, 966 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987). Moreover, it is the administering agency rather than an interested party that should make the determination as to what methodology should be used. *Timken I,* 10 CIT [86] at 98, 630 F.Supp. [1327] at 1338 [ (1986) ].

14 CIT at ——, 747 F.Supp. at 736.

In this case, Commerce did not follow its general practice of including best information available rates in the calculation of the "all others" rate because, due to unusual circumstances discussed below, Commerce determined that the best information available rate assigned to Prosperity was not representative of the pricing practices of the noninvestigated companies. The Department reasons that its departure from its general practice was based on: 1) the disparity between the three verified rates and the highest rate in the petition [3], *i.e.,* approximately 20 times greater; 2) its examination of only the top 30 percent of total quota holdings; and 3) the small number of firms investigated, *i.e.,* four from a potential pool of over 300 firms. 55 Fed. Reg. at 30,738.

Plaintiff, in support of its argument, relies on numerous determinations setting forth the Department's general practice to

---

1. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 71–77, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 457–63 (1979).

2. The regulation governing final determinations requires the Secretary's final determination to include "[t]he estimated weighted-average

dumping margin, if any, for each person investigated." 19 C.F.R. § 353.20(a)(2)(ii) (1990).

3. Crystal was assigned 0.00 margin, Laws—0.22 percent margin, Comitex—5.86 percent margin, and Prosperity—115.15 percent margin. 55 Fed.Reg. at 30,744.

calculate the "all others" rate as a weighted average of all affirmative antidumping margins, including those based on the "best information available," excluding only respondents with zero or *de minimis* margins. *See* 55 Fed.Reg. at 30,738; *see, e.g., Cellular Mobile Telephones and Subassemblies From Japan; Final Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 45,447 (Oct. 31, 1985). Closer scrutiny of the following determinations relied on by Plaintiff reveals distinguishable facts from this case.

In *Photo Albums and Filler Pages From Korea; Final Determination of Sales at Less Than Fair Value,* 50 Fed. Reg. 43,754 (Oct. 29, 1985), the Department investigated six companies which accounted for 64% of all exports of photo albums and filler pages from Korea. The Department relied on best information available for United States Price ("USP") and Foreign Market Value ("FMV") because adequate responses were not submitted in an acceptable form by all of the six respondents. *Id.* at 43,755. In *64K Dynamic Random Access Memory Components (64K DRAM's) From Japan; Preliminary Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 50,649 (Dec. 11, 1985), the Department submitted questionnaires to four firms that accounted for a significant proportion of exports. The Department assigned a 94 percent antidumping duty margin to one respondent, Mitsubishi, because it failed to provide usable U.S. sales information on computer tape. *Id.* at 50,650. This 94 percent margin was used in calculating the "all others" rate in the preliminary determination. The Department, however, adjusted Mitsubishi's margin to 13.43 percent in its final determination based on corrected information which Mitsubishi provided. *64K Dynamic Random Access Memory Components (64K DRAM's) From Japan: Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 15,943, 15,954 (Apr. 29, 1986).

Plaintiff's reliance on *Antidumping; Fuel Ethanol From Brazil; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 5572 (Feb. 14, 1986) is inapposite because the Department did not rely on best information available in calculating United States price and foreign market value for the two respondents investigated. Rather, the Department relied on the verifiable information submitted by the companies, which accounted for approximately 90 percent of sales of fuel ethanol to the United States during the period of investigation. *Id.* at 5573. The fact that the Department determined high margins for both companies, 101.12 percent and 56.48 percent respectively, bears no weight to the facts of the present case.

In *Antidumping; Malleable Cast Iron Pipe Fittings, Other Than Grooved, From Taiwan; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 10,901 (Mar. 31, 1986), the Department investigated five companies that accounted for more than 60 percent of the exports to the United States during the period of investigation. *Id.* at 10,902. One of those companies, Young Shieng, did not respond to the questionnaire. Accordingly, the Department assigned it an 80 percent antidumping duty margin based on best information available. The Department also included this margin in the "all others" rate. The facts of this determination are distinguishable from those in the instant case because over 60 percent of the industry was investigated. Moreover, verified affirmative antidumping duty margins were assigned to the other four companies investigated ranging from 7.93 percent to 58.57 percent.

This Court has also recognized Commerce's general practice in calculating the "all others" rate in *Serampore Indus. Pvt., Ltd. v. United States,* 12 CIT 825, 828–29, 696 F.Supp. 665, 669 (1988). In *Serampore,* the Court noted Commerce's general practice in calculating the "all others" rate is to include all investigated firms that receive affirmative margins, including those based upon best information available. *Id.* The rational for including firms that have been assigned a best information available rate for failure to cooperate in the investigation is based upon Commerce's assumption that such firms which fail to cooperate are "more probably than not dumping." 12 CIT at 829, 696 F.Supp. at 669.

(citation omitted). Following this rationale, the Court in *Serampore* noted that "[a]n all others rate that excludes margins based on the best information available would ... with one exception, be skewed to reflect the pricing practices of nondumping firms rather than those firms that choose not to cooperate with Commerce's investigation." *Id.* The one exception the Court referred to involves the situation where a firm cannot cooperate with the investigation for reasons beyond its control, such as when a company goes out of business. *See, e.g., Final Determination of Sales at Less Than Fair Value: Certain Fresh Cut Flowers From Ecuador,* 52 Fed.Reg. 2128, 2132 (Jan. 20, 1987) (Department excluded the best information available rate used for Eden flowers in the "all others" rate because the firm "virtually collapsed" and many of the records disappeared when the original organizers left the company).

■ After an exhaustive review of the Department's general practice in this area, this Court finds that merely because the Department relies on best information available in its determinations, does not necessarily elicit blanket approval for use of antidumping duty margins based on best information available to be calculated in the "all others" rate. Moreover, Plaintiff seems to place great weight upon the "one exception" articulated in *Serampore.* This Court, however, finds that such a circumstance when a company goes out of business and, therefore, cannot fully or accurately respond to the questionnaire or participate in the investigation may be an occasion for one exception. Depending on the facts of another case, there may be occasions for other exceptions as well.

■ Such an occasion may be found in the facts of this case where only 30 percent, rather than the usual 60 percent, of the industry was investigated. In addition, that 30 percent was based on quota holdings instead of actual exports. It appears to this Court that such a stark deviation from Commerce's general practice in its traditional respondent-selection methodology for reasons set forth herein could lead to an inequitable result, thereby tip-

ping the burden to the remaining firms that did not participate in the investigation. In any event, although this obviously was not an ideal set of circumstances from the point of view of Commerce, it would seem that Commerce decided that it had little alternative based upon the information submitted to disregard the best information available rate of 115.15 percent for Prosperity. If Plaintiff is frustrated by such results, then it should have contested those issues fully at the administrative level. It cannot be permitted to raise these issues *de novo* at this point of the review.

Plaintiff submits that the Department's reason for deviating from its traditional respondent-selection methodology is "nonsensical" because the Department limited the number of respondents "over the vigorous objections of the NKSA and the respondents." Brief in Support of Plaintiff's Motion for Judgment on the Agency Record at 32. Thus, argues Plaintiff, the Department should not "be allowed to 'boot-strap' its decision on the 'all others' rate calculation from its own mistake in unreasonably limiting the number of respondents." *Id.*

Defendant points out that Plaintiff is precluded from raising the "60 percent issue" because Plaintiff failed to exhaust its administrative remedies. Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record ("Defendant's Brief") at 15. Although during the administrative proceedings, Defendant maintains, Plaintiff argued that Commerce should select a number of companies to cover the largest number of exports, Plaintiff failed to raise the 60 percent issue before Commerce and, therefore, should be precluded from raising it now.

Section 2637(d) of Title 28, United States Code, directs this Court to require, where appropriate, the exhaustion of administrative remedies. 28 U.S.C. § 2637(d) (1988). It is well established that "[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity

to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Compensation Comm'n of Alaska v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *see United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 36–37, 73 S.Ct. 67, 68–69, 97 L.Ed. 54 (1952); *Koyo Seiko Co., Ltd. v. United States,* 15 CIT ——, 768 F.Supp. 832, 835 (1991); *Kokusai Elec. Co. v. United States,* 10 CIT 166, 171, 632 F.Supp. 23, 28 (1986).

■ This Court observes that a failure to enforce the exhaustion of administrative remedies principle could lead to "frequent and deliberate flouting of the administrative processes [that] could weaken the effectiveness of an agency by encouraging people to ignore [administrative] procedures." *McKart v. United States,* 395 U.S. 185, 195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969). Further, the courts require exhaustion of administrative remedies to ensure that the agency and the interested parties fully develop the facts to aid judicial review. *Andrade v. Lauer,* 729 F.2d 1475, 1484 (D.C.Cir.1984). Ultimately, applying the exhaustion principle promotes judicial economy by avoiding duplication of fact-finding and, sometimes, judicial involvement altogether. *Id.*

This Court finds that Plaintiff did not contest in its complaint Commerce's deviation from its "normal" practice of investigating 60 percent of the industry, when it opted to only investigate 30 percent of the industry. Therefore, Plaintiff is precluded from raising that issue now. The Court takes notice, however, that Commerce deviated substantially from the statute when it relied on quota holdings and only investigated 30% of the industry based on those quota holdings.

■ It appears to this Court that Plaintiff could have raised these issues in the proceedings before Commerce regarding the type of investigation Commerce undertook and its deviation from the traditional respondent-selection methodology. Precisely because Plaintiff did not contest these issues, this Court will not consider whether basing the investigation on quotas

versus actual exports was correct. To do so would preclude the Court from the benefit of the analysis and consideration by the administrative agency.

Plaintiff also asserts that the Department's action frustrates the remedial purpose of the antidumping law. Commerce counters that, under these unusual circumstances, the inclusion of Prosperity's best information available rate in the calculation of the "all others" rate would have amounted to punishment of innocent parties and, therefore, would not provide for the remedial relief contemplated by the antidumping law. Defendant's Brief at 17–18.

■ As the courts have long recognized, the antidumping law is a remedial statute. *Chaparral Steel Co. v. United States,* 8 Fed.Cir. (T) ——, ——, 901 F.2d 1097, 1103–04 (1990). Thus, dumping duties are remedial, not penal, in nature. They "are 'additional duties' to equalize competitive conditions between the exporter and American industries affected." *Imbert Imports, Inc. v. United States,* 67 Cust.Ct. 569, 576, 331 F.Supp. 1400, 1406 n. 10 (1971), *aff'd,* 60 CCPA 123, CAD 1094, 475 F.2d 1189 (1973) (*citing C.J. Tower & Sons v. United States,* 21 CCPA 417, T.D. 46,943, 71 F.2d 438 (1934)). In *Badger–Powhatan v. United States,* 10 CIT 241, 250, 633 F.Supp. 1364, 1373 (1986), the Court concluded "that the statutory scheme [of the antidumping laws] requires that estimated antidumping duties be as closely tailored to actual antidumping duties as is reasonable given data available to ITA at the time the antidumping order is issued." (footnote omitted).

This Court found in *Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT ——, 717 F.Supp. 834, 837 (1989), that the exclusion of best information available rates from the "all others" rate, when they do not appear to be representative of the pricing practices in the country under investigation, may be reasonable because the inclusion of best information available rates can result in the application of "quasi-punitive rates to innocent parties." In *Asociacion Colombiana,* the Court stated that "parties not vol-

unteering are not guilty of something which requires punitive action," but are entitled to a "fair rate related to actual industry behavior, not a rate unduly related to petitioner's claims." 13 CIT at ——, 717 F.Supp. at 838, n. 5. Furthermore, the Court in *Asociacion Colombiana* found that

> Because the verified rates are so much lower than petitioner's rate and because some or all of the nonresponding companies appear to have had no motivation to respond, even if their rates would have been far below petitioner's, blanket use of petitioner's rate to calculate the 'all other rate' is not appropriate.

*Id.*, 717 F.Supp. at 837.

This Court finds that the application of a punitive, or even quasi-punitive, rate to innocent parties, such as the 353 companies affected by the "all others" rate, would be contrary to the antidumping duty law, which is intended to be remedial, not punitive. In the situation in which Prosperity's best information available rate is almost 20 times higher than the highest rate calculated upon the basis of verified information and two of the four respondents had zero or *de minimis* margins, there is simply no basis for assuming that Prosperity's best information available rate represents the pricing practices of the producers and exporters of the remaining 70 percent of the MMF sweaters exported from Hong Kong. Furthermore, the close relationship that some of these man-made fiber sweater companies appear to have with each other causes one to speculate why Prosperity refused to cooperate at the last part of the investigation. One might surmise that a possible motivation could have been to skew the computation of the "all others" rate to the disadvantage of competitors.

The antidumping statute requires that where reaching the 60 percent coverage would require investigation of an unusually large number of exporters, the Department may "use averaging or generally recognized sampling techniques" to select respondents. 19 U.S.C. § 1677f–1(a) (1988); 19 C.F.R. § 353.59(b) (1990). Where the Department does use sampling or averag-

ing, "such samples and averages shall be *representative* of the transactions under investigation." 19 U.S.C. § 1677f–1(b) (emphasis added). In *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT ——, 704 F.Supp. 1114, 1121 (1989), the court stated that the "ITA decided that sampling was required because of the large number of transactions involved, but more importantly, because the Colombian industry was composed of numerous small producers.... The second requirement under the statute is that the type of sampling employed yield representative results."

In the present case, the Department considered and rejected the use of generally recognized sampling techniques based on the science of statistical sampling. Administrative Record Document 50. Commerce then decided to use a modification of its traditional methodology to select respondents. The Department, in its *Final Determination*, stated:

> Normally, we base respondent selection on shipments or sales to the United States during a given period of time, as we did in the investigations of MMF sweaters involving the Republic of Korea and Taiwan. However, in this case, given the qualified and incomplete data available regarding shipments to the United States, we based respondent selection on the only complete information available at the time, *i.e.*, quota allocations. Based on this analysis, Comitex, Crystal, Laws, and Prosperity (combined with their related companies) accounted for 30 percent of the 1989 Hong Kong quota allocations.

*Final Determination*, 55 Fed.Reg. at 30,-736–37.

■ The representativeness of the investigated exporters is the essential characteristic that justifies an "all others" rate based on a weighted average for such respondents. *Serampore*, 12 CIT at 828, 696 F.Supp. at 668. For example, the Department has excluded from the "all others" rate a firm that it concluded was not representative of the unnamed exporters. Commerce stated that:

For purposes of this final determination ... the Department has determined that the application of the BIA rate for Taiwan Nitsuko to the "All Others" rate is inappropriate. The Department does not believe that the BIA rate calculation for Taiwan Nitsuko is representative of other unnamed Taiwan manufacturers because, as previously explained, the Department applied section 773(d) of the Act (the MNC [multinational corporation] provision) to calculate Taiwan Nitsuko's BIA rate. This resulted in comparisons being based only on merchandise produced and sold in Japan to that produced in Japan and sold in the United States.

*Final Determination of Sales at Less Than Fair Value: Certain Small Business Telephone Systems Thereof From Taiwan,* 54 Fed.Reg. 42,543, 42,550 (Oct. 17, 1989). The "all others" rate issue in Commerce's final determination of *Certain Small Business Telephone Systems Thereof From Taiwan* was contested by the Taiwanese manufacturers and exporters of small business telephone systems and subassemblies in *Auto Telecom Co. v. United States,* 15 CIT ——, 765 F.Supp. 1094 (1991). The Court found in *Auto Telecom* that

> [a]lthough Commerce ordinarily would have assigned the rate of 129.73 percent to the 'all other' category, *see, e.g., Certain Steel Wire Nails from Korea,* 47 Fed.Reg. 27392 (1982), a departure in this case was warranted given the circumstances and Commerce's obligation to be fair to everyone affected by its determinations, including non-participants. *See Asociacion Colombiana De Exportadores De Flores v. United States,* 13 CIT [——, ——], 717 F. Supp. 834, 838 n. 5 (1989) (Non-participants have a right to expect that Commerce's techniques will yield a fair rate related to actual industry behavior.), *aff'd,* 901 F.2d 1089 (Fed. Cir.), *cert. denied,* —— U.S. ——, 111 S. Ct. 136, 112 L.Ed.2d 103 (1990).

*Id.* at 1096–97 (footnote omitted). The Court, however, never reached the issue of whether Commerce should have calculated the 129.73 percent margin assigned to Taiwan Nitsuko in the "all others" rate or even whether the inclusion of that margin would be fair because these issues were not before the Court. *See id.* at 1098 n. 11.

This Court holds that the Department's exclusion of Prosperity's margin from the "all others" rate was a reasonable and proper exercise of administrative discretion based upon the unusual facts referred to throughout this opinion. Neither the statute nor the regulations prescribe the method by which the Department of Commerce must calculate the "all others" rate. Moreover, due to the fact that Plaintiff acquiesced in the deviation of the traditional methodology employed by Commerce at the administrative level, under the unusual circumstances of this case, Plaintiff has not exhausted its administrative remedies.

Based on the facts before this Court, it appears that Prosperity was not representative of the remaining firms in Hong Kong that were not named as respondents in the investigation because of the gross disparity between the Prosperity rate of 115.15 percent, based on best information available, and the next-highest Hong Kong rate of 5.86 percent and the exceptionally small number of respondents investigated—four out of a potential pool of over 350 firms. Thus, based on these unusual circumstances of the respondent-selection methodology, this Court finds that it was reasonable and proper for Commerce to exclude Prosperity from the "all others" rate.

For all the reasons discussed herein, this Court finds that the Department of Commerce acted within its discretion in excluding the Prosperity best information available rate of 115.15 percent from the calculation of the "all others" rate. Plaintiff's motion for judgment upon the agency record is denied. Commerce's final determination is upheld as supported by substantial evidence on the record and in accordance with law. This action is dismissed.