CHR. BJELLAND SEAFOODS A/S (NOW NORWEGIAN SALMON A/S), ET AL., PLAINTIFFS v. UNITED STATES, ET AL., DEFENDANTS, AND COALITION FOR FAIR ATLANTIC SALMON TRADE, DEFENDANT-INTERVENOR

Court No. 91–05–00364

(Dated October, 23 1992)

*Mudge Rose Guthrie Alexander & Ferdon* (N. David Palmeter and Jeffrey S. Neeley), for plaintiff.

*Stuart M. Gerson,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*A. David Lafer*), with *Robert J. Heilferty,* of counsel, Office of the Chief Counsel for International Trade, United States Department of Commerce, for defendant.

*Lyn M. Schlitt,* General Counsel, *James A. Toupin,* Assistant General Counsel, United States International Trade Commission (*William Kane*), for defendant.

*Collier, Shannon, Rill & Scott* (Michael Coursey), for defendant-intervenor.

MEMORANDUM AND ORDER

GOLDBERG, *Judge:* Plaintiffs, Norwegian Salmon A/S, et al., bring this action under section 516A of the Tariff Act of 1930, as amended, 19

U.S.C. §§ 1516a(a)(2)(A) (i)(II) and 1516a(a)(2)(B) (1988), challenging the final affirmative antidumping determination by the United States Department of Commerce, International Trade Administration ("Commerce") in *Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 7661 (1991), Commerce's final affirmative countervailing duty determination in *Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 7678 (1991), the final affirmative injury determination by the U.S. International Trade Commission ("Commission") in *Fresh and Chilled Atlantic Salmon From Norway,* Inv. Nos. 701–TA–302, 731–TA–454 (Final), USITC Pub. 2371 (April 1991), and the antidumping and countervailing duty orders entered therefrom.

This matter is before the court pursuant to plaintiffs' motion for review of the administrative determinations upon the agency record under USCIT Rule 56.1. The court has jurisdiction under 28 U.S.C. § 1581(c) (1988). The court reverses and remands the Commission's determination. The court reserves decision on its review of the challenged Commerce determinations pending the remand results from the Commission.

### The Merchandise

The product covered by the contested orders is the species Atlantic salmon (Salmon salar). Atlantic salmon is a whole or nearly-whole fish, typically (but not necessarily) marketed gutted, bled, and cleaned, with the head on. It is typically packed in fresh-water ice. The challenged orders do not cover fillets, steaks, or other cuts of Atlantic salmon, or frozen, canned, smoked or otherwise processed Atlantic salmon. *See Fresh and Chilled Atlantic Salmon From Norway,* 55 Fed. Reg. 11418 (1990); and *Fresh and Chilled Atlantic Salmon From Norway,* 55 Fed. Reg. 11423 (1990). Prior to January 1, 1989, imports of Atlantic salmon were classified under item 110.2045 of the Tariff Schedules of the United States Annotated. After that time, imports of Atlantic salmon were classified under items 0302.12.0060.8 and 0302.12.0065.3 of the Harmonized Tariff Schedules of the United States.

### Nature of Atlantic Salmon Industry

The Atlantic salmon industry operates on a three-year production cycle. Salmon eggs are hatched and the salmon is grown through their fry and parr stages in fresh-water tanks. After approximately 18 months, the salmon "smoltify." The smolt are placed in the ocean in large pens or cages where they grow to market size adult fish over a period of 18 to 24 months. Harvesting begins in late summer/early fall and continues until the following late spring/early summer.

### Background

On February 28, 1990, the Coalition for a Fair Atlantic Salmon Trade, representing domestic producers of fresh Atlantic salmon, filed a petition with Commerce alleging that imports of fresh Atlantic salmon from Norway were being sold in the United States at less than fair value, that the imports were being subsidized by a party described by 19 U.S.C.

§ 1671(a)(1) (1988), and that these imports were causing material injury to a United States industry. On March 20, 1990, Commerce initiated antidumping and countervailing duty investigations. *Fresh and Chilled Atlantic Salmon from Norway,* 55 Fed. Reg. 11418 (1990) and 55 Fed. Reg. 11423 (1990).

On April 17, 1990, the Commission made a preliminary determination that there was a reasonable indication that an industry in the United States was materially injured by reason of allegedly subsidized and less than fair value imports of fresh and chilled Atlantic salmon from Norway. *Fresh and Chilled Atlantic Salmon from Norway,* Inv. Nos. 701–TA–302, 731–TA–454 (Preliminary), USITC Pub. No. 2272 (1990).

Upon request by petitioner, Commerce extended the time for making its preliminary subsidy determination to no later than June 21, 1990. On June 29, 1990, Commerce issued a preliminary determination that benefits, which constituted subsidies within the meaning of 19 U.S.C. § 1671(a)(1), were being provided to producers or exporters in Norway of fresh and chilled Atlantic salmon. *Fresh and Chilled Atlantic Salmon from Norway,* 55 Fed. Reg. 26727 (1990). In addition, Commerce directed the U.S. Customs Service to suspend liquidation of all entries of fresh and chilled Atlantic salmon from Norway, and it ordered a cash deposit or bond for all entries of this product equal to NOK 0.77/kilogram, the amount of the preliminarily determined net subsidy. *Id.*

On August 3, 1990, the petitioner alleged that, based upon the price information provided in questionnaire responses, Norwegian sales to third countries were being made below the cost of production. Commerce determined that petitioner presented sufficient information to support its allegation and commenced a cost of production investigation on August 20, 1990. *See Fresh and Chilled Atlantic Salmon from Norway,* 55 Fed. Reg. 40418 (1990).

On October 3, 1990, Commerce issued a preliminary determination that imports of fresh and chilled Atlantic salmon from Norway were being, or were likely to be, sold in the United States at less than fair value. *Id.* Commerce ordered that cash deposits or a bond be required on the subject imports in the amount of the estimated preliminary dumping margins, which for most of the investigated Norwegian firms ranged from 1.6 to 4.9 percent *ad valorem. Id.*

Following Commerce's affirmative preliminary determinations, the Commission instituted final material injury investigations. *Fresh and Chilled Atlantic Salmon from Norway,* 55 Fed. Reg. 31246 (1990) (final countervailing duty investigation); and *Fresh and Chilled Atlantic Salmon from Norway,* 55 Fed. Reg. 45867 (1990) (final antidumping investigation).

On October 28, 1990, Commerce terminated suspension of liquidation in accordance with article 5, paragraph 3 of the Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General

Agreement on Tariffs and Trade. *Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 7678 (Final) (1991).

Commerce issued a final affirmative determination on February 25, 1991 that imports of Atlantic salmon from Norway were being, or were likely to be, sold in the United States at less than fair value as provided in Section 735 of the Tariff Act of 1930, as amended (19 U.S.C. 1673d(a) (1988)), *Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 7661 (1991); and that certain benefits which constitute subsidies within the meaning of Section 701 of the Tariff Act of 1930, as amended, were being provided to producers and exporters in Norway of fresh and chilled Atlantic salmon. *Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 7678 (1991).

In its final determination on April 1, 1991, the Commission, with Acting Chairwoman Anne E. Brunsdale dissenting, affirmed its preliminary determination that the domestic Atlantic salmon industry was materially injured by reason of subsidized and less than fair value imports of fresh and chilled Atlantic salmon from Norway. *Fresh and Chilled Atlantic Salmon from Norway,* Inv. Nos. 701–TA–454 and 701–TA–302 (Final), USITC Pub. 2371 (April 1991); *see also Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 14535 (1991).

Thereafter, plaintiffs commenced this action challenging various aspects of Commerce's subsidy and antidumping determinations and the Commission's injury determination.

## STANDARD OF REVIEW

The court does not conduct a *de novo* review of determinations by Commerce and the Commission in antidumping and countervailing duty cases. *Zenith Radio Corp. v. United States,* 437 U.S. 443 (1978). Instead, the court is charged to hold unlawful any determination which is not supported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1) (1988).

Substantial evidence is more than a mere scintilla. *See Carlisle Tire & Rubber Co. v. United States,* 9 CIT 520, 622 F. Supp. 1071 (1985). It is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 50, 592 F. Supp. 1318, 1321 (1984) (citation omitted). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620 (1966). This standard of review accords deference to an agency's conclusions. It is not the court's function to decide that it would have made another decision on the basis of the evidence. *Matsushita Elec. Indus. Co. v. United States,* 3 Fed. Cir. (T) 44, 54, 750 F.2d 927, 936 (1984).

However, the court should not defer to an interpretation of a statute by an agency which alters the clearly expressed intent of Congress, *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368 (1986), or where "there are compelling indications that

that interpretation is incorrect" *Borlem S.A. v. United States,* 8 Fed. Cir. (T) 164, 913 F.2d 933, 937 (1990). Moreover, the court should not accord deference to an agency's decision that is based on inadequate analysis. *USX Corp. v. United States,* 11 CIT 82, 88, 655 F. Supp. 487, 492 (1987). The court will affirm the determinations of Commerce and the Commission if they are reasonable and supported by the record as a whole, even where there is evidence which detracts from the substantiality of the evidence. *Atlantic Sugar, Ltd. v. United States,* 2 Fed. Cir. (T) 130, 136, 744 F.2d 1556, 1563 (1984).

## DISCUSSION

Plaintiffs challenge the Commission's causation finding in this case. Specifically, they argue that: (1) the Commission's determination that the volume of Norwegian imports is "significant" is unsupported by substantial evidence because the Commission improperly minimized the evidentiary weight of volume data from 1990; (2) the Commission's determination that Norwegian imports depressed prices to a significant degree is not supported by substantial evidence; and (3) the Commission's determination that Norwegian imports were negatively impacting the domestic industry at the time it made its determination is not supported by substantial evidence and is contrary to law.

The court reverses the Commission's material injury determination and remands the case to the Commission. Specifically, the court finds that the Commission improperly gave diminished weight to the volume data of the subject imports in 1990. The court further finds that the Commission's determination that the subject imports were negatively impacting the domestic industry in March 1991 is unsupported by substantial evidence and contrary to law. The court need not decide whether the Commission's price depression determination is supported by substantial evidence since it reverses the Commission's determination on other grounds.

Plaintiffs also argue that Commerce's final affirmative determinations of subsidies and sales at less than fair value are unsupported by substantial evidence and are not in accordance with law. The court reserves decision on these issues in light of its decision regarding the Commission portion of this case.

A. *The Commission's Determination Regarding Volume of Imports:*

Plaintiffs assert that the Commission's material injury determination should be reversed because its determination that the volume of Norwegian imports was significant is unsupported by substantial evidence.

In an antidumping or countervailing duty investigation, the Commission must determine whether:

> (A) an industry in the United States—
> > (i) **is materially injured,** or
> > (ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports * * *.

19 U.S.C. §§ 1671d(b)(1) (1988) and 1673d(b)(1) (1988) (emphasis added).

To make its material injury determination, the Commission must consider four factors:

(I) the volume of imports of the merchandise which is the subject of the investigation,

(II) the effect of imports of that merchandise on prices in the United States for like products, and

(III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States; and

(ii) * * * other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

19 U.S.C. § 1677(7)(B)(i) & (ii) (1988)

In considering the volume of imports factor, the Commission must consider whether the volume of subject imports, or any increase in that volume is significant. 19 U.S.C. § 1677(7)(C)(i) (1988).

The Commission's finding that the domestic Atlantic salmon industry was materially injured hinged on its analysis of the volume of imports factor, namely, the "large increase in Atlantic salmon imports from Norway during the period of investigation through 1989." *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371 at 21. In fact, this volume data was the pivotal starting point in the Commission's analysis of the remaining three factors — the effect of Norwegian imports on prices, their impact on domestic producers of like products, and other relevant economic factors.

In its consideration of the volume of imports factor, the Commission determined that the volume of subject imports surged from 1987 to 1989, reaching 7.6 million kilograms in 1987, 8.9 million kilograms in 1988, and 11.4 million kilograms in 1989. *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371 at A–43 (1991). However, the volume of imports decreased in 1990 to 7.7 million kilograms; and the Commission reported no data on the volume of Norwegian imports in 1991. *Id.*

The Commission placed great emphasis on the volume of imports for the period 1987 through 1989 and assigned reduced weight to the data regarding the volume of imports in 1990. It gave "less weight to the recent decline in imports in 1990 because it appear[ed] to be largely the result of the filing of the petition and/or the imposition of provisional antidumping and countervailing duties." *Id.* at 17. The Commission claims that this proposition is supported by the record since the drop in Norwegian Atlantic salmon imports was "most pronounced since July, 1990, subsequent to Commerce's preliminary CVD determinations." *Id.*

at 17–18. Accordingly, the Commission found the "volumes of imports from Norway over the period of investigation, and the increases in those volumes from 1987 to 1989" to be significant. *Id.* at 18.

Furthermore, when imports decrease after the filing of an antidumping or countervailing duty determination, or after the imposition of such duties, the Commission maintains that it may properly presume that this decrease is a result of such filing or duty imposition. In this case, the Commission argues that there is a legal presumption that the Norwegians decreased the volume of subject imports in 1990 as a result of the imposition of countervailing duties on that merchandise.

Plaintiffs assert that the Commission's material injury determination is flawed. Plaintiffs contend that the Commission erred in assigning less evidentiary weight to the 1990 data. They claim that the record evidences that the decline in Norwegian imports in 1990 is not attributable to the presumptive effect of the imposition of antidumping and countervailing duties, but rather to the appreciation of the Norwegian kroner against the U.S. dollar.

In *Matsushita Elec. Indus. Co. v. United States,* the court held that in **that** review, the "antidumping order * * * **can** be presumed to distort the meaningfulness of observable data regarding present conduct in the U.S. market." *Matsushita Elec. Indus. Co. v. United States,* 6 CIT 25, 34, 569 F. Supp. 853, 862 (1983), *reh'g denied* 6 CIT 187, 573 F. Supp. 122 (1983), *rev'd on other grounds,* 3 Fed. Cir. (T) 44, 750 F.2d 927 (1984) (emphasis added). While there may be a presumptive effect regarding the imposition of antidumping or countervailing duties, it is, in this court's view, a rebuttable one.

In her dissent to the Commission's final injury determination, Acting Chairwoman Brunsdale argued that there is not substantial evidence to support the Commission's finding regarding the effect of the imposition of the duties. To the contrary, she found that there was substantial evidence in the record to support plaintiffs' argument and rebut this "presumption."

Specifically, Acting Chairwoman Brunsdale's dissent indicates that the record shows that between January and December of 1990, the Norwegian kroner appreciated 15 percent against the U.S. dollar, while it depreciated slightly against the currencies of Norway's major customers in the EC. *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371 at 34 (dissent), (citing Resp. ITC Preh. Br. Exh. 17). Antidumping and countervailing duty petitions were filed in the United States in February, 1990. Similar antidumping proceedings were undertaken in the European Economic Community ["EC"] at about the same time. *Id.* at 33. Norwegian imports declined in the United States in 1990, as the dollar declined. Yet, Norwegian imports rose in EC countries, despite the antidumping proceedings there. *Id.* Norwegian imports to EC countries increased almost 56 percent from 1989, as the European currencies appreciated slightly against the kroner. *Id.,* (citing Resp. ITC Preh. Br. Exh. 15).

Acting Chairwoman Brunsdale also found that the case of Sea Star International, a Norwegian exporter of Atlantic salmon, contravenes the Commission's presumption. She explains that the record shows that Sea Star, a Norwegian exporter of Atlantic salmon, was preliminarily found to be receiving countervailable subsidies. *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371 at 34. She also points out that Sea Star was the only Norwegian exporter preliminarily found not to be dumping Atlantic salmon in the United States. *Id.* Thus, after the preliminary countervailing duty was terminated on October 28, 1990, Sea Star's salmon was not subject to any antidumping or countervailing duties upon entry into the United States until Commerce rendered its final countervailing duty order on April 5, 1991. *Id.* Despite the absence of any antidumping or countervailing duties on their merchandise during the end of 1990, Sea Star's sales to the United States plummeted. *Id.* Therefore, Acting Chairwoman Brunsdale concluded that the Commission's volume finding was not supported by the record.

In its rejection of the 1990 data, the Commission relies solely on its presumption that Norwegian imports declined in 1990 in response to the filing of antidumping and countervailing duty petitions or the imposition of additional duties. The Commission summarily dismissed plaintiffs' adverse evidence, stating:

> Respondents claim that the decline in Norwegian imports in 1990 was the result of the appreciation of the Norwegian kroner against the U.S. dollar * * *. Although it is possible that these factors may have played some role, they cannot entirely account for the drastic decline that occurred in the second half of 1990.

USITC Pub. No. 2371 at 18.

The Commission fails to explain, as it must, its conclusion that the decrease in the volume of imports in 1990 cannot be the result of the appreciation of the Norwegian kroner against the U.S. dollar. *See Bowman Transportation v. Arkansas-Best Freight System,* 419 U.S. 281, 285 (1974); *see also Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962). In addition, the Commission failed to distinguish, or merely acknowledge, record evidence that the volume of Norwegian imports to the EC increased, despite the fact that similar antidumping proceedings were underway there. Moreover, the Commission ignored the decrease in Sea Star's U.S. sales data during the latter part of 1990.

Thus, there is not substantial evidence on the record to support a finding by the Commission that the decline in imports in 1990 was the result of the imposition of antidumping and countervailing duties or that the volume of imports or the increase in that volume is significant. The court holds that the Commission improperly minimized the evidentiary weight of the 1990 volume data.

B. *The Commission's Determination Regarding Present Material Injury:*

In an antidumping or countervailing duty investigation, the Commission must determine whether an industry in the United States **is mate-**

**rially injured** by reason of imports. 19 U.S.C. §§ 1671d(b)(1) (1988) and 1673d(b)(1) (1988) (emphasis added).

Both plaintiffs and defendants agree that the material injury statutes require the Commission to make a present material injury determination. However, their interpretations of what constitutes a present injury differ. The Commission argues that the continuing effects of an injury which occurred in the past can constitute present injury. Plaintiffs contend that the injury itself must be occurring in the present, and that the effects of a previous injury, being felt presently, cannot constitute present injury.

The legislative history of the material injury statutes demonstrates that Congress intended to require the Commission "to determine whether an industry in the United States **is being** * * * [materially] **injured.**" S. Rep. No. 49, 96th Cong., 1st Sess. 86 (1979) (emphasis added). Case law further explains that the purpose of the antidumping and countervailing duty scheme is to "equalize competitive conditions" between exporters and a domestic industry. *National Knitwear & Sportswear Ass'n v. United States,* 15 CIT 548, 779 F. Supp. 1364, 1372 (1991). Thus, it is evident that these duties are remedial, and not penal, retaliatory or compensatory. *See National Knitwear,* 779 F. Supp. at 1372; *Chaparral Steel Company v. United States,* 8 Fed. Cir. (T) 101, 901 F.2d 1097, 1103 (1990) (quoting S. Rep. No. 1298, 93rd Cong., 2d Sess. 123, *reprinted in* U.S.C.C.A.N. 7186, 7267); and S. Rep. No. 1221, 92nd Cong., 2d Sess. 8 (1972).

Furthermore, both the Court of Appeals for the Federal Circuit and this court have interpreted the material injury statutes to charge the Commission with determining "whether an industry suffers **present** injury." *Chaparral Steel Co. v. United States,* 901 F.2d at 1104 (citing *American Spring Wire Corp. v. United States,* 8 CIT 20, 22, 590 F. Supp. 1273, 1276) (emphasis added); *see also British Steel Corp. v. United States,* 8 CIT 86, 90, 593 F. Supp. 405, 408 (1984).

Moreover, the court has recognized the necessity and desirability of harmonizing the antidumping and countervailing duty laws with the international agreements they were intended to implement, including the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade ("GATT"). *See Matsushita Elec. Indus. Co. v. United States,* 6 CIT at 31, 569 F. Supp. at 859 (1983); and 19 U.S.C. § 2503(a) (1988). The GATT emphasizes that dumped and subsidized imports must **be causing** injury, and not simply be a source of injury in the past. *See* Agreement on Implementation of Article VI of the GATT, Art. 3, para. 4 (evidence must show dumped imports **are** * * * **causing injury);** and Art. 9, para. 1 (duties shall remain "in force only as long as * * * necessary to counteract dumping which **is causing** injury") (emphasis added).

Indeed, the Commission itself has interpreted the material injury statutes as directives to examine whether a domestic industry **is currently being injured** by subsidized or less than fair value imports. *See*

*12-Volt Motorcycle Batteries from Taiwan,* Inv. No. 731–TA–238 (Final), USITC Pub. No. 2213 (Aug. 1989) ("The time period for which we collect data — three years in most cases — merely serves as a historical frame of reference for an analysis of the **current** condition of the domestic industry at the time of the Commission's determination.") (Emphasis added).

Based upon the language of the statutes themselves, their legislative history, their interpretation by the courts, and the Commission itself; this court holds that the Commission's charge is to determine whether subject imports are causing present injury to the domestic industry.

Thus, the question for the court is whether the Commission's finding that imports from Norway were causing present material injury to the domestic industry at the time of the Commission's determination was supported by substantial evidence.

The material injury factor considered by the Commission which is most relevant to whether the Commission made a present injury determination is the impact of subject imports on the domestic industry. To examine this impact, the Commission must evaluate all relevant economic factors which have a bearing on the state of the domestic industry. Relevant economic factors include, but are not limited to:

> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity;
> (II) factors affecting domestic prices;
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment; and
> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the product.

19 U.S.C. § 1677(7)(C)(iii) (1988).

The Commission must consider these economic factors within the context of the business cycle of the Atlantic salmon industry. *Id.*

Relying on a "lingering effects" theory, the Commission found that subject imports impacted negatively on the domestic industry in three ways. First, declining prices on domestic Atlantic salmon from mid-1988 to 1989, allegedly resulting from the presence of Norwegian imports in the marketplace, caused a decrease in U.S. sales revenue in 1989. *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371 at 20. The decrease in U.S. sales revenue contributed to operating losses for the domestic industry in 1989. *Id.* These losses, in turn, increased cash-flow pressures. *Id.* Since the salmon industry operates on a three year production cycle, producers must absorb feeding, labor and overhead costs for several years before receiving any revenues from the adult fish. The Commission found that these cash flow pressures caused the largest U.S. producer, Ocean Products, to sell salmon in 1989 before they reached maturity, sacrificing a higher price per pound in order to generate revenues to continue operations. *Id.* at 20–21.

Second, the Commission found it "likely that the leveling off of production of juvenile salmon in 1990 was a response to the depressed prices prevailing in 1989." *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371 at 21.

Third, the ITC found that bank financing for the U.S. industry was more difficult to obtain because of the low prices in 1988 and 1989 or the oversupply of Norwegian salmon. *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371 at 20–21.

All of the Commission's examples of negative impact on the domestic industry appear to be effects of an injury which occurred in 1989. The Commission justified its claimed *present* material injury determination by finding "'present' injury in the form of continuing effects." *ITC Opposition Brief at 35;* and *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371. The Commission stated that "the effects of the large increase in Atlantic salmon imports from Norway during the period of investigation through 1989 **are being felt presently** by the young U.S. industry in such forms as financial losses, a scaled-back size, and difficulty in obtaining capital. *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371 at 21 (emphasis added). The Commission contends that these "lingering effects" are evidence that the domestic industry is being injured.

The Commission also argues that the consideration of these "lingering effects" in its present material injury analysis is consistent with the Commission's duty to evaluate the impact of imports "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *See* 19 U.S.C. § 1677(7)(C)(iii). The legislative history of 19 U.S.C. § 1677(7)(C)(iii) explains that its text was passed to clarify that the Commission "should not examine the health or condition of an industry in any abstract sense * * * [but] in the context of the dynamics of that particular industry sector." H. R. No. 40, 100th Cong., 1st Sess. 128 (1987). Congress also instructed the Commission to closely examine whether the business cycle of an industry is causing current industry data to indicate that the industry is not being injured, when in fact, it is. For example:

> [I]n the livestock sector, certain factors relating to the state of a particular industry within that sector may appear to indicate a favorable situation for that industry when in fact the opposite is true. Thus, gross sales and employment in the industry producing beef could be increasing at a time when economic loss is occurring, *i.e.,* cattle herds are being liquidated because prices make the maintenance of the herds unprofitable.

S. Rep. No. 96–249, 96th Cong., 1st Sess. 88 (1979).

The court recognizes that 19 U.S.C. § 1677(7)(C)(iii) directs the Commission to consider the material injury factors in the context of an industry's business cycle. However, this section does not authorize the Commission to base a material injury determination on the lingering effects of a past injury. Rather, it instructs the Commission to more thor-

oughly examine the factors in its material injury analysis where there is a possibility that negative effects of a present injury are latent.

In the court's view, to fulfill the present material injury requirement, the Commission must find that an American industry is currently being injured. A determination that the effects of a previous injury are presently being felt will not suffice. To permit these lingering effects to satisfy the present injury requirement of 19 U.S.C. §§ 1671d(b)(1) and 1673d(b)(1) would frustrate the solely remedial purpose of the antidumping and countervailing duty statutes, which are intended to "equalize competitive conditions between the exporter and American industries affected." *Imbert Imports, Inc. v. United States,* 67 Cust. Ct. 569, 576, 331 F. Supp. 1400, 1406 n. 10 (1971) *aff'd,* 60 CCPA 123, CAD 1094, 475 F.2d 1189 (1973) (citing *C.J. Tower & Sons v. United States,* 21 CCPA 417, T.D. 46,943, 71 F.2d 438 (1934)). Therefore, the court finds the Commission's affirmative material injury determination unsupported by substantial evidence and contrary to law.

### CONCLUSION

For the reasons provided above, the court reverses the Commission's final affirmative injury determination as unsupported by substantial evidence and contrary to law. The court remands the case to the Commission. On remand, the court directs the Commission to reevaluate the record in this case in accordance with the directions provided herein, gather any necessary evidence, and determine whether this industry was being materially injured by subject imports from Norway at the time of the Commission's final determination.

ORDERED: That the U.S. International Trade Commission shall report the results of its remand determination to the Court within 60 days of the date of this Order.